## JOSEPH UPTON'S CASE.

No. 12-P-325.

Suffolk. February 11, 2013. - October 18, 2013.

Present: TRAINOR, KATZMANN, & SIKORA, JJ.

*Workers' Compensation Act,* Emotional distress. *Words,* "Personnel action."

This court concluded that a workplace investigatory interview of an employee constituted a personnel action within the meaning of the workers' compensation act, G. L. c. 152, § 1(7A) (act), given that employer conduct need not alter an employee's status or his employment relationship to constitute personnel action under the act, and employer conduct such as supervisory criticism or questioning, which may lead to status-altering events such as termination or demotion, can constitute personnel action; accordingly, the employee was not entitled to workers' compensation benefits for any resulting disability. [414-419]

APPEAL from a decision of the Industrial Accident Reviewing Board.

*Timothy J. Casey,* Assistant Attorney General, for the employer.

*Michael C. Akashian* for the employee.

SIKORA, J. An employee is not entitled to workers' compensation benefits for an "emotional disability arising principally out of a bona fide, personnel action." G. L. c. 152, § 1(7A), as inserted by St. 1986, c. 662, § 6. At issue in this case is whether a workplace investigatory interview causing employee Joseph Upton's emotional disability constituted a bona fide personnel action within the meaning of § 1(7A) of the workers' compensation act (act). An administrative judge of the Department of Industrial Accidents (department) concluded that it did and, accordingly, denied Upton's claim. The department's reviewing board (board) reversed; it reasoned that the interview did not constitute a personnel action because it did not alter Upton's employment status or his employment relationship. For the following reasons, we conclude that the interview was a personnel

action within the meaning of the act and therefore hold that Upton is not entitled to workers' compensation benefits for any resulting disability.

*Background.* The material facts are largely undisputed. They include a history of long-running litigation. Our summary draws from the uncontested subsidiary findings of the administrative judge and the facts settled by prior decisions of the Supreme Judicial Court and this court.

In 1991, at age twenty-four, Upton began work as a jail officer of the Suffolk County sheriff's department (sheriff). In 1999, two other jail officers assaulted an inmate while Upton was on duty. See *Sheriff of Suffolk County* v. *Jail Officers & Employees of Suffolk County*, 451 Mass. 698, 699 (2008) (*Sheriff of Suffolk County I*). A disciplinary hearing officer found that Upton had filed false and untimely reports about the assault; had provided false information regarding the incident to the sheriff's investigative division; and had failed to maintain the log book in his unit. Upton was terminated. *Ibid.* He grieved the termination to arbitration. In March of 2001, the arbitrator reduced the sanction to a six-month suspension without pay and ordered Upton's reinstatement with back pay and benefits for any time span beyond the six months, "less any outside earnings and/or unemployment compensation." *Sheriff of Suffolk County* v. *Jail Officers & Employees of Suffolk County*, 465 Mass. 584, 586 (2013) (*Sheriff of Suffolk County II*).

The sheriff appealed from the arbitration order to the Superior Court upon the ground that it violated "well-defined public policy." See *Sheriff of Suffolk County I, supra* at 699-700. A judge of the Superior Court confirmed the arbitrator's award; this court affirmed that judgment. *Sheriff of Suffolk County* v. *Jail Officers & Employees of Suffolk County*, 62 Mass. App. Ct. 915 (2004). Thereafter the Supreme Judicial Court denied the sheriff's application for further appellate review without prejudice and remanded the case to the Appeals Court for reconsideration in light of its decision in *Boston* v. *Boston Police Patrolmen's Assn.*, 443 Mass. 813 (2005), addressing public policy grounds for vacation of arbitration awards. See *Sheriff of Suffolk County I, supra* at 700. This court then affirmed the Superior Court judgment confirming the arbitrator's award.

*Sheriff of Suffolk County* v. *Jail Officers & Employees of Suffolk County*, 68 Mass. App. Ct. 903 (2007). Subsequently the Supreme Judicial Court granted the sheriff's application for further appellate review. In 2008, nearly nine years after the underlying incident, the Supreme Judicial Court affirmed the judgment of the Superior Court confirming the arbitrator's award.[1] *Sheriff of Suffolk County I, supra* at 703.

In accordance with the arbitrator's order, the sheriff reinstated Upton, and he resumed work as a jail officer in August of 2008. Under the terms of the order, the sheriff owed Upton back wages, less any outside earnings and unemployment compensation accrued by him after termination. The sheriff prepared an "offset earnings" document detailing Upton's outside earnings during the relevant time period. In September, 2008, Upton signed this document under the pains and penalties of perjury. See *Sheriff of Suffolk County II, supra* at 587.[2] Shortly thereafter, the sheriff uncovered new information suggesting that Upton had failed to disclose all his posttermination earnings. On November 25, 2008, two investigators from the sheriff's office called Upton into a meeting to discuss this possible discrepancy. In accordance with the governing collective bargaining agreement, a representative from Upton's union attended the meeting as well.

Shortly after the meeting, Upton went to a hospital emergency room with complaints of shortness of breath, tingling in his arm, and pain in his chest. He was unable to return to work, and filed a claim for § 34 total incapacity benefits, and alternatively for § 35 partial incapacity benefits, medical benefits under G. L. c. 152, §§ 13 and 30, § 50 interest, and attorney's fees and costs under § 13A. On May 18, 2009, an administra-

---

[1]Although the Supreme Judicial Court found that the arbitrator's findings on Upton's participation in the violations were not sufficiently clear, it concluded that the death of the arbitrator and the unavailability of several key witnesses made a remand impractical. *Sheriff of Suffolk County I, supra* at 702-703 & n.3. The court therefore affirmed the Superior Court judgment confirming the arbitrator's award. *Ibid.*

[2]In the 2013 decision, the Supreme Judicial Court addressed the question whether Upton had a duty to mitigate damages during his separation from employment. It concluded that he did bear such a duty but that the sheriff had waived the issue by failure to raise it earlier in the administrative proceedings. *Sheriff of Suffolk County II, supra* at 585, 588-592.

tive judge denied his claim. Upton appealed, and a hearing went forward before the same administrative judge over four days in January, February, and March of 2010. In September of 2010, the administrative judge denied Upton's claim on the ground that his disability had resulted from a bona fide personnel action under § 1(7A).

Upton appealed, and the board reversed. It concluded that the investigative interview causing his injury was not a personnel action because it did not alter Upton's employment status or his employment relationship. It was not "akin to 'a transfer, promotion, demotion, or termination,' " and therefore, the board reasoned, did not constitute a personnel action under the act. The board ordered a de novo hearing upon the extent of Upton's disability. It is undisputed that Upton was unable to work for a period of time after the investigatory interview (i.e., the end of November, 2008, until October 20, 2010) and that that disability resulted from his emotional reaction to the investigative interview.[3]

*Analysis.* Our task is to determine whether the workplace meeting resulting in Upton's emotional disability constituted a personnel action within the meaning of § 1(7A) of the act. We conclude that employer conduct need not alter an employee's status or his employment relationship to constitute personnel action under § 1(7A). Employer conduct such as supervisory criticism or questioning, which may lead to status-altering events such as termination or demotion, can constitute personnel action. We view the investigative interview injuring Upton to have been personnel action within the meaning of § 1(7A) and therefore hold that he is not entitled to workers' compensation benefits.

We begin with an examination of the words of the statute, "but not in isolation from the statute's purpose or divorced from reason and common sense." *DiGiacomo* v. *Metropolitan Property & Cas. Ins. Co.*, 66 Mass. App. Ct. 343, 346 (2006). As always, we interpret a statute "according to the intent of the Legislature ascertained from all its words construed by the

---

[3]The administrative judge adopted the impartial physician's opinion that the interview was the predominant contributing cause of Upton's emotional disability. He found also that the action was bona fide. The reviewing board accepted both of these findings, as do we.

ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). In short, we study a provision's language and its purpose. See *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001), and cases cited. And, in circumstances of an administrative scheme, we weigh the view of the agency charged with implementation of the provision. See *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 515-516 (1975), and cases cited.

1. *Language.* In relevant part, G. L. c. 152, § 1(7A), recites that "[n]o mental or emotional disability arising principally out of a bona fide, personnel action including a transfer, promotion, demotion, or termination except such action which is the intentional infliction of emotional harm shall be deemed to be a personal injury within the meaning of this chapter." If the Legislature had intended to define personnel action exclusively as transfer, promotion, demotion, or termination, it would have used the phrase "consisting of" rather than "including." The word "including" implies some additional actions and, inferably, activity leading up to such actions as the listed ones. As the administrative judge accurately observed, "[a] personnel action can be a process." The climactic event of a transfer, promotion, demotion, termination, or other significant change of status seldom emerges from a procedural vacuum.

The board reasoned that the Legislature could have applied the phrase "including but not limited to" as the introduction to the described job actions if it had intended other events or procedures to fall within the meaning of "personnel action." It had used that phrase to exclude from coverage "voluntary participation in any recreational activity, including but not limited to athletic events, parties, and picnics" sponsored by the employer, § 1(7A), second sentence, inserted by St. 1985, c. 572, § 11. The absence of the words "not limited to" contributed to the board's conclusion that the Legislature was limiting the meaning of personnel action only to conduct in the nature of transfer, promotion, demotion, and termination.

In our view, that interpretation gives too much weight to a

minor difference in phrasing between two sentences inserted at different times and as part of different exceptions. "The various sentences of § 1(7A) were adopted piecemeal over time and are best understood not as an all-encompassing definition of compensable 'personal injury,' but, rather, as a series of legislative responses to specific court decisions and perceived needs for targeted reform." *Cornetta's Case*, 68 Mass. App. Ct. 107, 114 (2007). The Legislature inserted the exclusion of a bona fide personnel action by St. 1986, c. 662, § 6, a year after the enacted exception for recreational activity and in response to the decision of *Kelly's Case*, 394 Mass. 684, 684-685, 687 (1985) (permitting compensation for emotional injury resulting from notification of layoff and transfer).

A final point is in order. It is undisputed that the original "termination" of Upton in 2000 constituted a personnel action and set in motion a marathon process of arbitration and adjudication over the ensuing years. The arbitrator's award of finite suspension and a computation of back pay comprised an integral part of that process. In 2008, the parties were still resolving the back pay element of the award by the determination of the genuine amount of Upton's independent income during the period of separation. The investigative interview sought to determine that amount and to implement finally the arbitral award of years before. It was an event within the boundaries of the original and continuing personnel action and not an afterthought or a remedial detail unrelated to the original termination sanction. It was the final remedial stage of the extended personnel action.

2. *Purpose.* The personnel action exception was one element of a sustained legislative pattern in the 1980s and 1990s "to rein in compensation for work-related mental and emotional disabilities unassociated with physical injury." *Cornetta's Case*, *supra* at 117. On three separate occasions the Legislature restricted the coverage of such injuries. In 1985, it amended § 1(7A) to make it clear that the act bars recovery for purely emotional injuries unless the employee can prove that "an event or series of events in the workplace" was "a contributing cause" of the injury. *Id.* at 116. In 1986, the Legislature heightened the standard of causation by requiring that the cited workplace

event be a "significant contributing cause" of the employee's emotional injury. In the same legislation, it inserted the personnel action exception at issue here as a further limitation of employer liability for emotional injuries. Finally, in 1991 the Legislature raised the standard of causation once more by replacing the requirement that the event be a "significant" contributing cause of the emotional injury with the requirement that it be the "predominant" contributing cause. *Id.* at 117.[4]

Further, it appears improbable that the Legislature would purposefully prohibit compensation for such serious and formal events as transfer, promotion, demotion, and termination, but then allow compensation for the preliminary and tentative events of investigation and fact finding about the employment relationship or performance. A formal change of employment status is far more likely to cause emotional or mental health consequences than supervision, criticism, and investigation. Those preliminary activities may cause concern for an employee, but they do not inflict the impact of a final job action. If the Legislature intended to bar coverage for emotional injury caused by status-altering action, it most logically intended to bar coverage for emotional injury caused by the preliminary and less serious processes of supervision, criticism, and investigation.

Finally, the extension of the exception to such preliminary process respects the legitimate efforts of the employer to regulate competence and integrity at the workplace without risk of workers' compensation liability for emotional consequences of good faith supervision. For sound reasons an employer may justifiably inquire into complaints or suspect behavior. The sheriff maintains a published set of standards and procedures governing departmental investigations of incidents and personnel. A parallel set of standards and procedures constitutes an article of the collective bargaining agreement between the sheriff's department and Upton's union. Obviously both the employer and the

---

[4]In the course of its decision, the board acknowledged the legislative trend, but then omitted it from its interpretation of the personnel action exemption. It reasoned instead that the original "beneficent design" of statutory coverage remained in force, with citation to *Young* v. *Duncan*, 218 Mass. 346, 349 (1914). *Ibid.* It is unlikely that far earlier and general case law would override the later and specific statutory amendments recounted and interpreted by *Cornetta's Case, supra* at 112-118.

employee recognized and regulated such investigations as an inherent element of their relationship. Fairly conducted inquiries furnish the employee the opportunity to refute suspicion or criticism and the employer the information necessary for accurate personnel decisions. The Legislature did not plausibly intend to expose those processes to workers' compensation liability for the purely emotional consequences experienced by affected employees.

3. *Agency interpretation.* Although we accord substantial deference to an agency's interpretation of a statute which it must administer, see, e.g., *Bisazza's Case*, 452 Mass. 593, 597 (2008), "ultimately the 'duty of statutory interpretation is for the courts.' " *Higgins's Case*, 460 Mass. 50, 53 (2011), quoting from *Moss's Case*, 451 Mass. 704, 709 (2008). *Spaniol's Case*, 466 Mass. 102, 106 (2013). The policy of judicial deference is not a practice of judicial abdication, see *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976), and we may reverse a decision of the board if it is not in accordance with the law. G. L. c. 30A, § 14(7)(c). The degree of deference depends on several factors, including (1) the agency's participation, if any, in the drafting of the act; (2) the duration of the agency's position, especially if it arose contemporaneously with the enactment; and (3) the consistency over time of the agency view. *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. at 515-516, and cases cited.

The present record furnishes no information about the department's participation in the enactment of the personnel action exception. The board's current interpretation of the exception did not arise contemporaneously with the enactment. The board has not held it previously or consistently. Before enactment, it had concluded that an employee was not entitled to compensation for emotional injury caused by notice of her impending transfer to another department. See *Kelly's Case*, 394 Mass. at 685.[5] After enactment, the board viewed a personnel action as activity additional to transfer, promotion, demotion, and termination; it could consist of such lesser activity as good faith

---

[5]The subsequent reversal of the board's position by the Supreme Judicial Court, *Kelly's Case*, *supra* at 687-689, caused the Legislature to insert the personnel action exception. See *Cornetta's Case*, *supra* at 117.

supervisory criticism. See *Beaudry* v. *Stop & Shop*, 4 Mass. Workers' Comp. Rep. 239, 241 (1990) ("[W]hatever the legislative intent, [the exception] clearly reaches beyond the four events set out as illustrations of bona fide personnel actions"). We do not find any prior case in which a majority of board members have adopted the current position.

In sum, the usual factors supporting deference for an agency interpretation are absent. Rather, the board's view in this instance appears to contradict the Legislature's visible and progressive restriction of workers' compensation for purely emotional injury in general and emotional injury attributed to good faith personnel actions in particular.

*Conclusion.* We therefore reverse the decision of the board and remand the case to the department for entry of an order denying the employee's claim for benefits by reason of any disability resulting from the interview on November 25, 2008.

*So ordered.*