Macdonald, D. Lloyd, J.
Before the Court are the plaintiffs motion and the defendant’s cross motion for summary judgment. The dispute arises from the plaintiff Town of Swansea’s (the ‘Town’s”) termination of Swansea Police Officer Marc Soares (“Soares”) after the Town received a hearing officer’s finding of just cause for discipline. The defendant police union (the “Union”) and Soares appealed by exercising their collective *518 bargaining-based right to a hearing before an arbitrator. The arbitrator confirmed the finding of just cause but amended the termination sanction to a 90-day suspension. The Town submits that on the facts found by the arbitrator any sanction other than termination would be contrary to public policy. The Court agrees and ALLOWS the Town’s motion and DENIES the Union’s.
Discussion Legal Principles
Because the Court cannot improve on it, the Court quotes at length from the Appeals Court’s 2009 opinion in City of Boston v. Boston Police Patrolmen’s Association, 74 Mass.App.Ct. 379, 380-81 (2009) (Brown, J.), addressing similar issues:
A reviewing court usually accords great weight to the parties’ election, particularly from collective bargaining agreements, to submit a dispute to arbitration. See Boston v. Boston Police Patrolmen’s Assn., 443 Mass. 813, 818, (2005) {Boston), and cases cited. General Laws c. 150C, §11, enumerates narrow grounds upon which a court may vacate an arbitration award. The Supreme Judicial Court mandates the following three-part de novo analysis to ascertain whether the order to vacate the arbitration award adheres to §11(a)(3) requirements. See Boston, supra at 818-819. “First, the public policy must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.” Sheriff of Suffolk County v. Jail Officers & Employees of Suffolk County, 68 Mass.App.Ct. 903, 904 (2007). Second, the conduct involved cannot be “disfavored conduct, in the abstract.” Massachusetts Hy. Dept v. American Fedn. of State, County & Mun. Employees, Council 93, 420 Mass. 13, 17 (1995) (quotations omitted). Third, “the arbitrator’s award reinstating the employee [must violate] public policy to such an extent that the employee’s conduct would have required dismissal. Merely showing that the conduct is disfavored by public policy is not sufficient.” Bureau of Special Investigations v. Coalition of Pub. Safety, 430 Mass. 601, 605 (2000) (quotations and citation omitted).
The question of public policy is ultimately one for resolution by courts, not arbitrators. See id. at 603; Sheriff of Suffolk County v. Jail Officers & Employees of Suffolk County, 451 Mass. 698, 700 (2008). That said, given the “strong public policy favoring arbitration . . . the judiciary must be cautious about overruling an arbitration award on the ground that it conflicts with public policy.” Bureau of Special Investigations v. Coalition of Pub. Safety, supra at 603-604 (quotations omitted).
Factual Basis
Soares’s discipline was based on the following facts found by the arbitrator:[1]
Rhode Island Arrest for Driving Under and Subsequent Drug Assessment
On May 6, 2008 Soares, an eight-year commended veteran of the Swansea police force, was arrested by the State Police in Rhode Island on Interstate 95 for driving under the influence of drugs or alcohol after a motorist called 911 to report that Soares was “weaving back and forth between lanes, almost swerving into the median, and traveling at speeds ranging from 20 to 95 MPH.” HO at 5. ARB at 5-6. Various prescription receipts and a rolled up $20 bill consistent with a device to inhale narcotic drugs was seized. ARB at 6. HO at 7 and 12. Soares was uncooperative with the Rhode Island trooper. HO at 5. He was determined to be unfit to drive. ARB at 6.
Upon learning that Soares was a police officer, the Rhode Island State Police called the Swansea Police, and the Swansea Deputy Chief and another Swansea officer retrieved Soares from the Rhode Island authorities. When they arrived at the Rhode Island barracks, “Soares was agitated, his eyes were glassy, his speech was slurred, and his tongue was thick.” HO at 7. ARB at 6-7. Soares denied that he had ingested any drugs and that he only had a beer a day or two before. ARB at 7. He adamantly stated that there had been no reason to stop him and that the Rhode Island police “had blown things out of proportion.” Soares was “defiant and in denial.” Id. He informed the Swansea Police Chief that “he wanted to get retribution against [the Connecticut troopers].” HO at 7.
The arbitrator concluded: “Under the circumstances, there appears to be no issue that the Rhode Island State Police were justified in stopping his vehicle. Their description of [Soares] as appearing to be under the influence of drugs is similarly warranted based upon his slurred speech, thick tongue and overall appearance.” ARB at 26.
Blood and urine tests were ordered and disclosed that Soares had traces of three narcotic drugs in his system, including anti-psychotic medication, some of which were consistent with the prescription receipts found in his car. ARB at 8-9. HO at 8-9.
In the meantime, Soares revised his account as to his drug ingestion and acknowledged having consumed Xanax on the day of the incident. ARB at 10. HO at 6 and 12.
Soares acknowledged having failed to comply with the Swansea Police rules and regulations requiring disclosure of taking mind and mood affecting medications. ARB at 26 and 28. HO at 8.
Approximately a month after the Rhode Island arrest, the Swansea Chief ordered that Soares be examined by a psychiatrist who was a Certified Medical Review Officer. ARB at 10. In his testimony before the Hearing Officer, the Medical Review Officer “expressed great concern with Officer Soares extensive opiod/opiate use on an ‘as needed’ basis and noted that the CVS records [provided by Soares] show consistent use of *519 prescriptions of up to 90 pills a month (i.e., approximately three a day). HO at 11.
The Medical Review Officer concluded that Soares was unfit even then (two months after his arrest in Rhode Island) to return to duty. ARB at 10. HO at 10-11. After reevaluating Soares in September 2008, the Medical Review Officer reaffirmed his determination that he was unfit for duty. HO at 11.
The Swansea Chief also ordered that Soares be examined by a psychologist specializing in mental health issues affecting police and fire departments. The specialist advised the Chief: “(There had been] a recent pattern of grave and repeated instances of poor judgment and impulse control, possibly involving lying and criminal conduct, all taking place in the context of a serious and poorly controlled medical situation involving major neurological and psychiatric symptoms and the use of medications that may adversely affect basic cognitive skills necessary to perform the police job. [Soares’s] life at present [August 11, 2008] is medically, psychologically, and behaviorally unstable.” HO at 16.
Rehoboth/Swansea Unreported Automobile Accidents
On May 11, 2008 (less than a week after his Rhode Island arrest) following dinner in Providence with his girlfriend who was involved in the third incident discussed below, Soares’s motor vehicle struck a utility pole in Rehoboth causing very substantial damage to his truck. Soares did not stop or report the incident. Instead, he continued toward his home, and while passing through Swansea, he struck another pole causing additional damage. Again, he left the scene. In driving to His home in Swansea, Soares drove past the Swansea Police Station without stopping. He then parked the vehicle in his garage and went to bed. ARB at 11-12. HO at 12-14.
The arbitrator noted, “[Soares] admitted that in parking the truck in the covered garage, he was trying to conceal the damage to his truck.” ARB at 11 and 27. Soares “admitted that concealing the accident was a violation of law.” ARB at 27.
Among the damage that was sustained to Soares’s totaled truck was the blow-out of one of the tires. HO at 14. He drove the truck home on the bare rim of at least one of the wheels. Despite Soares having failed to report the accidents, officers who responded to scenes of the accidents were able to follow the gouge marks in the roadway caused by the truck’s bare rim to Soares’s home. ARB at 11.
When later questioned, Soares denied that he had consumed either drugs or alcohol and claimed to have fallen asleep at the wheel. The arbitrator noted the hearing officer’s conclusion that “[Soares] has to have been fully conscious of his actions after the first incident . . . [and that the hearing officer] did not believe [Soares’s] claim that he did not use drugs or alcohol prior to the accident.” ARB at 12.
Soares was charged in the Taunton District Court with two counts of leaving the scene of an accident involving properly damage. The cases were combined and then continued for a year, after which they were dismissed. ARB at 12.
Easton, Connecticut Shooting and Death Investigation
At the time of the above incidents, Soares had a longstanding relationship with a woman, Vickey Branco (“Branco”), who Soares later acknowledged had a serious addiction problem. ARB at 14. She was a professional “exotic dancer,” and on the evening of May 6 and early morning of May 7, 2008, Branco and another dancer were engaged to perform “ ‘bachelorette’ services” and a “personal performance” at a residence in Easton, CT. ARB at 12-13. However, things got out of control, and Branco and her associate were allegedly held against their will before being able to flee from the house. Shortly after they escaped, five shotgun blasts were directed at the house. When Easton police officers responded to the scene, they were confronted by a person in the house, who was then shot and killed by the officers. ARB at 13-14.
In the ensuing investigation by the Easton police, Branco’s cell telephone records were obtained, and it was determined that in the three-hour period surrounding Branco’s being involuntarily detained, her escape and the drive-by shooting, she and Soares had 48 telephone calls and text messages.[2] However, when interviewed by the Easton investigators in August 2008, Soares denied a memory of the incident, denied recalling any “exigency” in Branco’s voice around then and denied any recollection of the night in question. ARB at 14.
The arbitrator noted that the hearing officer concluded that Soares was “evasive” and “misleading” in his response to the Easton law enforcement investigation. ARB at 15. The lead Easton investigator concluded that Soares was untruthful. In his findings the hearing officer stated: “I . . . find it incredible that Officer Soares could not remember the calls in more detail and did not know anything about what was happening to Ms. [Branco] at the time of the calls.” The hearing officer concluded: “I do not find credible Officer Soares’ testimony about the calls and I do credit the testimony of [Easton] Officer Doyle concerning Officer Soares’ truthfulness.” HO at 19. ARB at 15.[3]
Comparative Discipline of Fellow Swansea Police Officer
In June 2009, Swansea Police Officer Kyle Stone (“Stone”), was arrested in New Hampshire for driving under the influence while off-duty. Stone had been on the force for three years. He allegedly asked the arresting officer to let him go as a “professional courtesy.” When the officer did not do so, Stone “intentionally banged his head against the cruiser’s partition and feigned injury in an attempt to disrupt the arrest procedure.” Stone pleaded guilty to first offense driv *520 ing-under. After being brought up on administrative charges, Stone was suspended from the Swansea force for 90 days. ARB 16-17.
The Arbitrator’s Conclusion
In evaluating all of the facts, the arbitrator concluded: “I find that the Town had just cause to discipline [Soares] but that termination was excessive and not warranted under a just cause standard. The Town is required to apply its rules, orders and penalties evenhandedly and without discrimination to all employees. [Soares], as a more senior employee, was entitled to the same consideration that was accorded Officer Stone whose conduct was found to be criminal.” ARB at 30.[4]
Rulings of Law
It is impossible for the Court to comprehend a rational basis for the arbitrator’s decision to reduce Soares’s termination to a mere suspension.
The record established conduct comprising multiple violations of the criminal law and of fundamental provisions of the Department’s rules and regulations.
In the Rhode Island incident, Soares was driving in a blatantly hazardous fashion under the influence of narcotic drugs and obstructed the Rhode Island State Police investigation by lying about his condition and conduct.
Soares (eventually) admitted to the two offenses of leaving the scene of an accident causing property damage, but in its immediate aftermath, Soares again obstructed a criminal investigation by lying as to the material circumstances surrounding them.
In the Easton, Connecticut investigation of a possible kidnapping, the drive-by shooting and death of a person present at the site of the kidnapping and shooting, the defendant again obstructed law enforcement by feigning a lack of memory to intentionally mislead the investigators.
“A police officer who [violates the law] and then shrouds his own misconduct in an extended web of lies and pequred testimony, corrodes the public’s confidence in its police force.” Boston v. Boston Police Patrolmen’s Assn., supra, 443 Mass, at 820. “That [Soares] has not been convicted of any felony [is] beside the point ... It is the felonious misconduct, not a conviction of it, that is determinative. For an arbitration award to violate public policy, it need not violate the letter of a statute.” Id. “The Legislature has forbidden persons found to have engaged in such conduct from becoming police officers and, by implication, from remaining police officers.” Id. at 821. “That other police officers may have received lesser sanctions for their serious misconduct avails nothing here. Each case must be judged on its own facts, and the factual record in those cases is not before us . . . Leniency toward egregious police misconduct in the past (assuming such leniency occurred) cannot lead a police officer to commit reprehensible actions in the expectation that he will receive a light punishment.” Id. at 823.
Although the facts in the 2009 Boston SJC case just quoted from are not identical to the case before the Court, the gravity of the law enforcement officer’s misconduct is substantially similar. The SJC’s conclusion bears repetition (and reinforcement) here:
The public policy against requiring the reinstatement of police officers who have committed felonious misconduct stems from the necessity that the criminal justice system appear legitimate to the people it serves. People will not trust the police—on the street or in court—unless they are confident that police officers are genuine in their determination to uphold the law. As the [Town] reminds us, police legitimacy would be damaged severely by reports that the city continued to employ a police officer who had illegally abused his power and repeatedly lied about it under oath. Indeed, [such an officer as Soares’s] involvement in an investigation could prejudice the public against an otherwise flawless criminal prosecution.
Id. at 823.
For these reasons, the Town’s motion must be allowed.
ORDER
The plaintiff Town of Swansea’s motion for summary judgment is ALLOWED. The defendant Union’s cross motion is DENIED. Judgment shall enter accordingly.

The arbitrator’s decision (“ARB”) was not explicit on a number of material facts. However, the arbitrator adopted in substance the particularized findings of the hearing officer who presided at a five-day evidentiary hearing in 2010. The hearing officer’s decision was attached to the complaint as Exhibit B (“HO"). As will be discussed further below, the substantive focus of the arbitrator’s decision was on his conclusion that the termination of Soares was inconsistent with the 90-day suspension that a fellow officer had been disciplined with after a driving-under conviction. The arbitrator concluded, in the interest of even-handedness and consistency, that anything more severe was inappropriate for Soares.

“The AT&T records further indicate a total of one hundred and twelve (112) calls or messages between Soares and Branco during the period from 2:36 a.m. to 7:24 a.m. on May 7 and also indicate that a good number of those calls or messages were initiated by Officer Soares, not Ms. Branco.” HO at 18.

The arbitrator did not reject the hearing officer’s affirmative findings, but noted that “there are several factors that aid [Soares’s] contention that he could not recall all the conversation that he had with Ms. Branco on the morning of May 7, 2008.” ARB at 27. Of these factors, the arbitrator principally identified the circumstance that Branco had described Soares as “out of it.” ARB at 28. In the same paragraph, however, the arbitrator found that Branco’s “testimony was mostly discredited.” Id. Further, it is inherently improbable that over the five-hour period in which Soares had 112 separate communications with Branco, he could not recall the substance of any of them. Accordingly, the hearing officer’s findings stand.

The arbitrator did not directly address the constellation of violations of law and of the Swansea Police Department’s rules and regulations and of the Law Enforcement Code of Ethics as the hearing officer had done. HO at 23-38. However, by implication, the arbitrator found the substance of the itemized violations and chose to dispose of the matter on the above ground of disparate treatment.