NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12077


   CITY OF BOSTON  vs.  BOSTON POLICE PATROLMEN'S ASSOCIATION.



       Suffolk.    December 5, 2016. - July 12, 2017.

   Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, & Budd, JJ.


Arbitration, Confirmation of award, Authority of arbitrator.
     Municipal Corporations, Police.  Police, Discharge.  Public
     Employment, Police, Termination.  Public Policy.



     Civil action commenced in the Superior Court Department on July 22, 2013.

     The case was heard by Dennis J. Curran, J.

     The Supreme Judicial Court granted an application for direct appellate review.


     Kay H. Hodge (Geoffrey R. Bok also present) for the plaintiff.
     Alan H. Shapiro (John M. Becker also present) for the defendant.


     HINES, J.  This is an appeal from a judgment of the

Superior Court confirming an arbitrator's award reinstating a

Boston police officer terminated for using a choke hold in

arresting an unarmed suspect for disorderly conduct and making

false statements in the ensuing departmental investigation.  The arbitrator found that the officer, David Williams, had applied a choke hold, but that the choke hold had not actually choked the citizen, that the force was reasonable in the circumstances, and that the officer's subsequent characterization of events was thus truthful.  Accordingly, the arbitrator ruled that the city of Boston (city) lacked just cause to terminate Williams, and ordered his reinstatement with back pay.

In July, 2013, the city filed a complaint in the Superior Court to vacate the arbitrator's award.  The court dismissed the complaint in June, 2015, and the city appealed.  We granted the city's application for direct appellate review.  Because the award neither exceeds the arbitrator's authority nor violates public policy, and because we are not free to vacate it where no underlying misconduct was found, we affirm.

1.  Background.  a.  Facts.  On January 18, 2012, the city discharged Williams based on specifications arising from a disorderly conduct arrest on March 16, 2009.  The specifications were use of excessive force, in violation of Boston police department rule 304 on use of nonlethal force, and untruthfulness in the subsequent investigation, in violation of rule 102, § 23, on truthfulness.  Chosen by mutual agreement of the city and the Boston Police Patrolmen's Association (union) pursuant to a collective bargaining agreement (CBA), an

arbitrator held three days of hearings, concluded that the city had proved neither charge, and ordered Williams's reinstatement with back pay.  He based his conclusion on the following factual findings.

In 2009, Boston's Saint Patrick's Day Parade fell on Sunday, March 15.  Among the revelers that day were Michael O'Brien and his friends Thomas Cincotti and Eric Leverone.  Having consumed some alcohol during the daytime celebrations, the three proceeded to a Faneuil Hall bar where O'Brien received free drinks by virtue of knowing the staff and owners.  Because Leverone had recently returned from active military duty, patrons purchased him many drinks, and he became extremely intoxicated.

From that bar, the three walked to Cincotti's apartment in the North End neighborhood of Boston.  While his friends waited on the sidewalk, Cincotti moved his motor vehicle to avoid getting a parking citation the next day.  In doing so, he backed across a double yellow line and into a double-parked vehicle occupied by Guy Fils-Aime.  Cincotti got out of his vehicle, asked O'Brien to move it out of the street, and approached Fils-Aime.  O'Brien testified that, before moving the vehicle to a

legal parking space, he heard Fils-Aime say, "I am a federal agent and you are fucked."[1]

Fils-Aime called 911 just after midnight to report the accident. On that recorded call, he can be heard to say, "No, no, no. Don't worry. I work for Homeland Security. I'm a Federal agent. You're not going to get in trouble. Relax." After describing the accident to the dispatcher, Fils-Aime added, "They're drunk."

Officers Williams and Diep Nguyen arrived on scene at 12:08 A.M. O'Brien described their interaction as immediately hostile and aggressive, while the officers characterized O'Brien and his friends as drunk and uncooperative. O'Brien, who with Cincotti and Leverone is Caucasian, appeared further provoked by the officers' friendliness with Fils-Aime, who like Williams is African-American. As the officers spoke with Fils-Aime, O'Brien approached and demanded that they issue a citation to Fils-Aime for double-parking, and find out whether he was in fact a Federal agent. Receiving no answer, O'Brien began to film the officers with his cellular telephone as he repeated his demands

---

[1] Michael O'Brien was at the time employed as a deputy sheriff and correction officer, and said that Guy Fils-Aime's comments made him concerned both for his employment and for his pending military candidacy.

from the middle of Hanover Street, where he was blocking traffic.[2]

After O'Brien failed to heed multiple warnings to get out of the street, Nguyen decided to arrest him for disorderly conduct. O'Brien pushed Nguyen away, and the two struggled as Nguyen attempted to handcuff him; he managed to cuff one wrist. Seeing this struggle from the cruiser where he had been writing a citation for Cincotti, Williams came to Nguyen's aid and tackled O'Brien to the ground; Nguyen was "fighting off" Cincotti and Leverone. In an effort to extricate O'Brien's uncuffed hand from underneath O'Brien's body, Williams pressed his upper left arm and shoulder against the right side of O'Brien's neck. He characterized this maneuver as a "semi-bear-hug hold." Nguyen testified that Williams had his arm "around [O'Brien's] neck" in a "chokehold." O'Brien testified that he could not breathe and began to lose consciousness.

Williams called for assistance using a police radio attached to his uniform, and the eight officers who soon arrived arrested O'Brien. As he was being taken to a police wagon, O'Brien announced his employment with the sheriff's office and shouted the names of officers he knew. Once in the wagon, he realized that he had urinated in his pants.

---

[2] The video recording was not in evidence, as O'Brien testified that he no longer was in possession of that cellular telephone.

O'Brien was charged with resisting arrest, assault and battery on a police officer (Nguyen), and disturbing the peace. He was booked at 12:40 A.M., with a bruise visible on his left temple and an abrasion on the right side of his forehead. Lieutenant James Leary, who was duty supervisor at that time, examined O'Brien and noted nothing unusual. Twenty minutes later, O'Brien complained of chest pain and head pressure, and emergency medical technicians thereafter transported him to Massachusetts General Hospital. The triage nurse, in notes recorded at 2:30 A.M., observed O'Brien to be under the influence of alcohol. At 3:43 A.M., O'Brien reported to the attending physician, Dr. Andrew Liteplo, that he had been beaten and choked by police. Liteplo noted petechiae, which are sometimes associated with choking, on O'Brien's face. O'Brien was otherwise asymptomatic.

On March 19, 2009, O'Brien filed a complaint with the internal affairs division (IAD) of the Boston police department (department). Although IAD assigned the complaint to an officer, little investigation was done, and O'Brien's counsel withdrew it in May, 2009. Williams did not learn of the allegations against him until September 24, 2009, when O'Brien filed a Federal lawsuit alleging unreasonable use of force, unconstitutional arrest, and assault and battery. The next day, counsel filed another IAD complaint; when IAD still had taken no

action in January, 2010, counsel sent a letter demanding that the matter be investigated. Sergeant Philip Owens conducted initial interviews of the officers in April, 2010, but not until February, 2011, was Williams placed on administrative leave.

A second round of IAD interviews occurred in March, 2011. In June, 2011, the department exonerated Nguyen, but issued two specifications against Williams: the use of unreasonable force, in violation of rule 304, § 2,[3] and untruthfulness during the IAD

---

[3] Boston police department rule 304, "Use of Non-Lethal Force," provides in relevant part:

"Because there are an unlimited number of possibilities, allowing for a wide variety of circumstances, no rule can offer definitive answers to every situation in which the use of non-lethal force might be appropriate. Rather, this rule will set certain specific guidelines and provide officers with a concrete basis on which to utilize sound judgment in making reasonable and prudent decisions, attending to the spirit over the letter of the rule.

"Section 1. Definitions. . . . 1. Reasonable Amount of Force is the least amount of force that will permit officers to subdue or arrest a subject while still maintaining a high level of safety for themselves and the public.

"Section 2. General Considerations. The policy of the Boston Police Department is to use only that amount of force that is reasonably necessary to overcome resistance in making an arrest or subduing an attacker.

"The right to use non-lethal force is extended to police officers as an alternative in those situations where the potential for serious injury to an officer or civilian exists, but where the application of lethal force would be extreme."

interview, in violation of rule 102, § 23.[4]  The departmental trial board held hearings in November and December, 2011, and sustained the charges.  The city terminated Williams on January 18, 2012, and settled O'Brien's civil lawsuit for $1.4 million shortly thereafter.

The union filed a grievance, contending that the city lacked just cause to terminate Williams.[5]  The case went before an arbitrator to determine whether the city had just cause to terminate Williams, and whether the city violated the CBA by placing Williams on administrative leave in February, 2011.  A hearing was held in September, October, and December, 2012.

b.  The arbitrator's award.  In June, 2013, the arbitrator issued his decision based on the premise that Williams had been terminated for use of excessive force, not for application of a choke hold ("The Department evidently credited O'Brien's charge that [Williams] attacked him for no reason, knocked him to the

---

[4] Boston police department rule 102, "Conduct and General Rights and Responsibilities of Department Personnel," provides in relevant part:

"Section 23.  Truthfulness. . . .  Reports submitted by employees shall be truthful and complete.  No employee shall knowingly enter, or cause to be entered, any inaccurate, false or improper information."

[5] Article V(A), § 1, of the collective bargaining agreement provides as follows:  "No bargaining unit member who has completed his one-year probationary period shall be disciplined or discharged without just cause."

ground, grabbed him around the neck, and strangled him almost to the point of unconsciousness").

Characterizing the case as contingent on a credibility determination, the arbitrator rejected O'Brien's account of the incident as "not truthful," and concluded that Williams used only the amount of force reasonably necessary to overcome O'Brien's resistance to arrest. In support of his finding that "O'Brien was not a credible witness about any of the events of March 16," the arbitrator cited several factors. First, the arbitrator found that O'Brien had been drunk; as a result, the accuracy of O'Brien's memory was diminished, and the likelihood that he had displayed the conduct Williams and Nguyen described increased. Second, the arbitrator found that the professional repercussions potentially facing O'Brien for his drunk and disorderly conduct provided a motive to fabricate these allegations against the officers. Third, he found the objective physical evidence of choking scant. Finally, he noted as further reasons to discredit O'Brien that the cellular telephone video recording was unavailable, and that neither Cincotti nor Leverone came forward to corroborate O'Brien's account.

As to Williams, the arbitrator found that he had "knock[ed] O'Brien to the ground and tightly gripp[ed] him in a manner that placed [Williams's] upper right arm and shoulder against the right side of O'Brien's neck. It would be accurate to call this

a chokehold." Nguyen, who the arbitrator credited as a "conscientious and credible witness," agreed that Williams had used a choke hold and explained that police were not trained in this maneuver. Nonetheless, Nguyen opined that Williams had not choked O'Brien and had used reasonable force in the circumstances, and the arbitrator agreed. Accordingly, the arbitrator concluded that Williams's IAD interviews had been truthful, and that there was no just cause for termination. He ordered Williams reinstated with back pay.

2. Discussion. a. Standard of review. "A matter submitted to arbitration is subject to a very narrow scope of review." Plymouth-Carver Regional Sch. Dist. v. J. Farmer & Co., 407 Mass. 1006, 1007 (1990). Especially where parties have elected to arbitrate disputes as part of a CBA, School Dist. of Beverly v. Geller, 435 Mass. 223, 229 (2001) (Cordy, J., concurring), we defer to that election and are "strictly bound by an arbitrator's findings and legal conclusions, even if they appear erroneous, inconsistent, or unsupported by the record." Lynn v. Thompson, 435 Mass. 54, 61 (2001), cert. denied, 534 U.S. 1131 (2002) (Thompson).

In arbitrations pursuant to collective bargaining agreements, awards may be vacated only on statutorily enumerated grounds. G. L. c. 150C, § 11 (a) (3) ("superior court shall vacate an award if . . . the arbitrators exceeded their powers

or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law").  The city argues both grounds exist here, and we address each in turn.

b.  Nondelegability of police commissioner's powers and scope of arbitrator's authority.  The city argues that the award must be vacated because the arbitrator exceeded his authority by intruding on the nondelegable powers of the Boston police commissioner (commissioner) to discipline officers.  The union counters that discharge and discipline are at the heart of collective bargaining, and the arbitrator merely interpreted the relevant terms of the parties' agreement.

Some powers may not be delegated, even with the consent of the parties.  Boston v. Boston Police Superior Officers Fed'n, 466 Mass. 210, 216 (2013).  "An arbitrator exceeds his authority when he intrudes upon decisions . . . left by statute to the exclusive managerial control of designated public officials." Massachusetts Bd. of Higher Educ./Holyoke Community College v. Massachusetts Teachers Ass'n/Mass. Community College Council/Nat'l Educ. Ass'n, 79 Mass. App. Ct. 27, 32 (2011). The city asserts that the so-called "police commissioner's statute" leaves discipline and discharge of officers for excessive force or untruthfulness to the commissioner's exclusive managerial control.  St. 1906, c. 291, as appearing in

St. 1962, c. 322, § 11 ("police commissioner shall have
cognizance and control of the government, administration,
disposition and discipline of the department, and of the police
force of the department and shall make all needful rules and
regulations for the efficiency of said police").  This argument
fails for three related reasons.

First, the terms of a CBA trump any authority enumerated
under the State's collective bargaining law.  G. L. c. 150E,
§ 7 (d) ("If a collective bargaining agreement . . . contains a
conflict between matters which are within the scope of
negotiations pursuant to [§ 6] of this chapter[6] and . . . the
regulations of . . . a police commissioner . . . the terms of
the collective bargaining agreement shall prevail").
Accordingly, the CBA's just cause provision permits the
arbitrator to interpret regulations promulgated pursuant to the
commissioner's statute, and usurps no authority in so doing.

Second, this conclusion is consistent with courts'
reluctance to allow broad discretionary powers to subsume
bargained-for provisions.  See Lynn v. Labor Relations Comm'n,
43 Mass. App. Ct. 172, 182 (1997), citing School Comm. of Newton
v. Labor Relations Comm'n, 388 Mass. 557, 564-566 (1983) ("where

---

[6] General Laws c. 150E, § 6, provides that parties "shall
negotiate in good faith with respect to wages, hours, standards
or productivity and performance, and any other terms and
conditions of employment."

the governmental employer acts pursuant to broad, general management powers, the danger is presented . . . that to recognize the statutory authority as exclusive would substantially undermine the purpose of G. L. c. 150E, § 6, to provide for meaningful collective bargaining").

Finally, although we have recognized the breadth of the commissioner's authority in a long line of cases, those cases have largely confined nondelegable matters to the administrative realm and have never reached the core matters of discipline and discharge. See, e.g., Boston Police Superior Officers Fed'n, 466 Mass. at 215 (commissioner has exclusive, nondelegable authority to assign and transfer police officers).[7] Indeed, where the parties bargained to arbitrate "any dispute concerning

---

[7] See also, e.g., Boston v. Boston Police Patrolmen's Ass'n, 403 Mass. 680, 684 (1989) (nondelegable management prerogative to assign one officer, as opposed to two, to marked patrol vehicle); Nolan v. Police Comm'r of Boston, 383 Mass. 625, 629-630 & n.4 (1981) (authority to determine by way of psychiatric examination officer's fitness to perform duties); Broderick v. Police Comm'r of Boston, 368 Mass. 33, 41 (1975), cert. denied, 423 U.S. 1048 (1976) (authority to question officers regarding private conduct); Boston Police Patrolmen's Ass'n v. Boston, 367 Mass. 368, 371-372 (1975) (authority to require officers seeking elective office to take leave of absence without pay during campaign); Boston v. Boston Police Superior Officers Fed'n, 52 Mass. App. Ct. 296, 301 (2001) (sole discretion to make and end temporary assignments); Boston v. Boston Police Patrolmen's Ass'n, 41 Mass. App. Ct. 269, 271-273 (1996) (authority to determine and assign overtime); Boston v. Boston Police Superior Officers Fed'n, 29 Mass. App. Ct. 907, 908 (1990) (nondelegable matters include staffing levels, assignments, uniforms, weapons, and definition of duties); Boston v. Boston Police Patrolmen's Ass'n, 8 Mass. App. Ct. 220, 226-227 (1979) (sole authority to determine whether officer should be reissued service weapon).

the interpretation or application" of the CBA, G. L. 150E, § 8, such a broad arbitration clause, see AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986), leaves discipline well within the arbitrator's ambit. Boston Police Patrolmen's Ass'n v. Boston, 60 Mass. App. Ct. 672, 676-677 (2004) (severity with which municipal employer treats its police officers in disciplinary proceedings can be subject of grievance).

c. Public policy exception. The city argues that the award must be vacated because Williams's reinstatement violates public policy. The union contends that this exception is unavailable because the court is bound by the arbitrator's finding that Williams committed no misconduct.

Our deference to arbitration notwithstanding, we recognize the primacy of certain policy matters over expediency, and will not allow an arbitrator to order a party to engage in an action that violates well-defined public policy. G. L. c. 150C, § 11 (a) (3). Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 818, 823 (2005) (Patrolmen's Association). If an arbitration award violates public policy, "we are obliged to refrain from enforcing it." Massachusetts Highway Dep't v. American Fed'n of State, County & Mun. Employees, Council 93, 420 Mass. 13, 16 & n.5 (1995), quoting W.R. Grace & Co. v. Local

Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 766 (1983).

In determining whether this narrow public policy exception requires the vacation of an arbitrator's award, we apply a "stringent, three-part analysis." Patrolmen's Association, 443 Mass. at 818. First, the policy at issue "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Massachusetts Highway Dep't, 420 Mass. at 16, quoting W.R. Grace & Co., 461 U.S. at 766. Second, the exception does not address "disfavored conduct, in the abstract, but [only] disfavored conduct which is integral to the performance of employment duties" (emphasis in original). Massachusetts Highway Dep't, supra at 17, quoting Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 671 (11th Cir. 1988), cert. denied, 493 U.S. 871 (1989). "Finally, we require[] a showing that the arbitrator's award reinstating the employee violates public policy to such an extent that the employee's conduct would have required dismissal." Patrolmen's Association, supra at 819, quoting Thompson, 435 Mass. at 63. The question in the third prong is not whether the employee's behavior violates public policy, but whether an award reinstating him or her does so. Eastern Associated Coal Corp.

v. <u>United Mine Workers of Am., Dist. 17</u>, 531 U.S. 57, 62-63 (2000).

The first two prongs of this test are easily satisfied in cases of alleged police misconduct toward civilians, as the Superior Court recognized below.  See, e.g., <u>O'Brien</u> v. <u>New England Police Benevolent Ass'n, Local 911</u>, 83 Mass. App. Ct. 376, 381 (2013) (in police excessive force case, it is "clear" that first two prongs of public policy test were met).  It is inarguable that well-defined public policy condemns excessive force by police officers.  See <u>Commonwealth</u> v. <u>Adams</u>, 416 Mass. 558, 563 (1993); <u>Human Rights Comm'n of Worcester</u> v. <u>Assad</u>, 370 Mass. 482, 487 (1976).

Similarly, there is no question that refraining from excessive force is integral to a police officer's duties to protect the public and keep the peace.  <u>Patrolmen's Association</u>, 443 Mass. at 819.  See <u>Attorney Gen</u>. v. <u>McHatton</u>, 428 Mass. 790, 793-794 (1999), quoting <u>Police Comm'r of Boston</u> v. <u>Civil Serv. Comm'n</u>, 22 Mass. App. Ct. 364, 371 (1986) ("Police officers must comport themselves in accordance with the laws that they are sworn to enforce and behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel.  They are required to do more than refrain from indictable conduct. . . .  In accepting employment by the public, they implicitly agree that they will not engage in

conduct which calls into question their ability and fitness to perform their official responsibilities").

Thus, only the exception's third prong remains contested here.  "To prevail, the city must therefore demonstrate that public policy requires that [Williams's] conduct, as found by the arbitrator, is grounds for dismissal, and that a lesser sanction would frustrate public policy" (emphasis added). Patrolmen's Association, 443 Mass. at 819.  Because the arbitrator found that Williams acted reasonably and truthfully, the public policy exception cannot bar his reinstatement.

The arbitrator found that Williams "placed [his] right arm and shoulder against the right side of O'Brien's neck."  Nguyen, who the arbitrator found to be "a conscientious and credible witness," testified that Williams had his arm "around [O'Brien's] neck" in a "chokehold."  But he also found that Williams was terminated not for use of a choke hold, which is nowhere prohibited by department rules, but for excessive force in choking O'Brien.  Because the arbitrator concluded that Williams's use of force was reasonable and had not actually restricted O'Brien's breathing, he also found that Williams's characterization of events had been truthful and that there was no just cause for termination.

Without doubt, a de novo analysis of whether Williams's actions constituted excessive force in the totality of the

circumstances could support a conclusion very different from the one reached by the arbitrator. This was an arrest for disorderly conduct. Williams gave no verbal commands, and used neither of the methods of nonlethal force in which he was trained before applying a choke hold,[8] despite his training to avoid a suspect's neck area.[9] Williams is significantly larger than O'Brien, who was unarmed. It is unreasonable to justify a choke hold -- as the arbitrator did -- on the grounds that a suspect could always "grab" an officer's service weapon, because this is true of any civilian interaction with police and would obviate any continuum of force.[10]

---

[8] The department authorizes the use of the following nonlethal force methods: verbal commands, pepper spray, wrist locks, and batons. It is uncontested that Williams attempted none of these methods before tackling O'Brien.

[9] Beyond requiring that officers use "the least amount of force" and "only that amount of force that is reasonably necessary to overcome resistance in making an arrest," rule 304 on the use of nonlethal force confines officers to the use of procedures on which they have been trained and found "proficient." Nguyen and Williams each admitted that this training did not include choke holds as an appropriate means of force, and the IAD investigator explained that Boston police officers are trained to avoid contact with a person's head or neck due to the high risk of injury.

[10] Indeed, the notion that an unarmed suspect must nonetheless be treated as dangerous because he or she interacts with an armed police officer ("[e]ven if O'Brien was unarmed, there was always the possibility that he would grab Nguyen's gun") controverts clear United States Supreme Court precedent, see Graham v. Connor, 490 U.S. 386, 396 (1989); Tennessee v. Garner, 471 U.S. 1, 11 (1985), and we reject the troubling

This is especially true given the unpredictably lethal nature of choke holds.  See, e.g., Los Angeles v. Lyons, 461 U.S. 95, 116-117 (1983) (Marshall, J., dissenting) ("It is undisputed that chokeholds pose a high and unpredictable risk of serious injury or death"); Thompson v. Chicago, 472 F.3d 444, 446 (7th Cir. 2006) (officer's application of choke hold contributed to suspect's death by asphyxia); Maddox v. Los Angeles, 792 F.2d 1408, 1411 (9th Cir. 1986) (officer's application of choke hold for twenty to thirty seconds caused suspect's death).  Cf. Commonwealth v. Stockwell, 426 Mass. 17, 19 n.2 (1997) (posited among methods of strangulation supporting conviction of murder in first degree, choke hold occurs when "the aggressor's forearm is placed on the neck of the victim").

Where the city failed to recognize those dangers in any rule, however, we are not free to redefine terms the parties bargained over.  Had the city prohibited choke holds as excessive force, an arbitrator who found a choke hold reasonable would have exceeded his authority.  See G. L. c. 150C, § 11 (a) (3) ("the superior court shall vacate an award if . . . the arbitrators exceeded their powers"); School Dist. of Beverly, 435 Mass. at 229 (Cordy, J., concurring), quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S.

presumption of a citizen's dangerousness that this proposition would create.

593, 597 (1960) ("[A]n arbitrator's 'award is legitimate only so long as it draws its essence from the collective bargaining agreement' that he is confined to interpret and apply").  In other words, that a de novo factual analysis would permit a finding of felonious conduct does not permit us to proceed as if the arbitrator actually made that finding.

We are aware of no prior application of the public policy exception to vacate an award ordering reinstatement where the arbitrator found no underlying misconduct.  See Patrolmen's Association, 443 Mass. at 820-821, 823 (vacating reinstatement of police officer found by arbitrator to have committed felonious misconduct of perjury and filing of false police reports); Boston v. Boston Police Patrolmen's Ass'n, 74 Mass App. Ct. 379, 382 (2009) (vacating reinstatement of police officer found by arbitrator to have committed off-duty felonious misconduct of assault by means of dangerous weapon).  The question, in other words, is not whether Williams's conduct justified termination, but whether it required termination, such that any lesser sanction would violate public policy.  See Thompson, 435 Mass. at 63.  Because the arbitrator found that Williams used reasonable force and was not untruthful in subsequent investigations, the award reinstating him must be upheld.

    d.  Prospective guidance.  Today's decision should not be read to view the city -- and more importantly, the citizens of Boston -- as without remedy moving forward.  First, it is incumbent on the city to clarify its own policies with respect to excessive force and specifically choke holds if it does not wish in the future to relinquish interpretive control of that term.

    As a threshold matter, it cannot be that when a choke hold is applied, the excessive force determination nonetheless depends on the extent of resulting harm.  See Stamps v. Framingham, 813 F.3d 27, 35 (1st Cir. 2016) (rejecting argument that inadvertent excessive force is shielded from scrutiny under Fourth Amendment to United States Constitution, reasoning that "[t]he defendants' proposed rule has the perverse effect of immunizing risky behavior only when the foreseeable harm of that behavior comes to pass").  If anything, it is the unpredictable dangerousness of choke holds that warns against their use at all.  Indeed, it is untenable to assert both that choke holds are so potentially dangerous that reinstating officers who use them violates public policy and that the commissioner retains the discretion to determine whether a choke hold is excessive force in any given case.  As discussed supra, it is because choke holds are unpredictably lethal that both officers and the public deserve a bright-line rule.

Second, the city must investigate allegations of excessive force with substantially more alacrity than was evidenced here. Pursuant to its own existing rules,[11] the department owes a duty, both to the public and to its own officers, to investigate allegations of excessive force thoroughly and promptly. As with the tension between a choke hold's dangerousness and the commissioner's desire to retain discretionary review of their use, it is difficult to reconcile the department's position that an officer's use of a choke hold requires termination with its protracted inaction in this case. See Massachusetts Highway Dep't, 420 Mass. at 21 n.8 ("In determining that the safety of the work environment was not sufficiently threatened by [the employee's] behavior to require permanent discharge, the arbitrator could consider the fact that the department waited nearly one year after the [misconduct] was discovered" before bringing disciplinary action). There was a two-year delay on meaningful internal investigation; the department concedes, as it must, that it mishandled an inquiry that took entirely too long. Officers deserve notice of allegations against them, and citizens deserve investigations not contingent on the filing of Federal lawsuits.

---

[11] See Boston police department rule 304, "Use of Non-Lethal Force," § 7, "Investigation of Use of Force."

Last, we are troubled by the prospect that any use of force not explicitly prohibited by a rule of conduct is essentially unreviewable.  It is difficult to fathom why we elevate the values of "expediency" and "judicial economy" so high as to eclipse the substantive rights of citizens who have no seat at the bargaining table.  We recognize, of course, that public employers may or may not choose to adopt rules for the protection of the public from the excessive use of force.  Without the benefit of such rules, however, arbitrators remain free to find reasonable any level of force that does not explicitly require termination.  Absent legislative authority for a broader review of arbitration decisions, we are constrained in our ability to review the use of excessive force by public safety officials.

3.  <u>Conclusion</u>.  For the reasons stated above, we affirm the Superior Court's decision confirming the arbitrator's award.

<u>So ordered</u>.