NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12450

CITY OF PITTSFIELD  vs.  LOCAL 447 INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS.

Berkshire.     May 7, 2018. - October 3, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.

Municipal Corporations, Police.  Police, Discharge.  Public Employment, Police, Termination.  Arbitration, Police, Confirmation of award.  Public Policy.

Civil action commenced in the Superior Court Department on May 11, 2017.

The case was heard by Daniel A. Ford, J.

The Supreme Judicial Court granted an application for direct appellate review.

Richard M. Dohoney for the plaintiff.
Timothy M. Burke (Jared S. Burke also present) for the defendant.
Eric R. Atstupenas, for Massachusetts Chiefs of Police Association, Inc., amicus curiae, submitted a brief.

CYPHER, J.  Dale Eason was terminated from his position as a police officer in the Pittsfield police department on grounds of conduct unbecoming a police officer, untruthfulness, and

falsifying records. His union, Local 447 International Brotherhood of Police Officers (union), filed a grievance, pursuant to a collective bargaining agreement between the union and the city of Pittsfield (city). The union and city submitted Eason's termination to arbitration with two agreed-upon issues: (1) "Was there just cause to terminate the employment of Dale Eason?"; and (2) "If not, what shall the remedy be?" The arbitrator found that there was not just cause for termination and reinstated Eason with a three-day suspension.

The city commenced an action pursuant to G. L. c. 150C, § 11, in the Superior Court to vacate the arbitrator's award, arguing that it is contrary to public policy. A Superior Court judge confirmed the arbitration award, and the city appealed. We thereafter granted the city's application for direct appellate review. We conclude that the arbitrator's award of reinstatement does not violate public policy in the circumstances of this case, where the arbitrator found that the officer's statements were "intentionally misleading" but not "intentionally false" and where the statements did not lead to a wrongful arrest or prosecution, or result in any deprivation of liberty or denial of civil rights.

Background. We recite the facts as found by the arbitrator. The case arose from a February, 2016, incident in which Eason responded to a reported larceny at a supermarket.

Eason arrested a woman, identified by supermarket security, and placed her in the back of his police cruiser.  In his arrest report, Eason said the suspect "began thrashing her body around in the back seat . . . .  For her safety, I attempted to remove the [suspect] from my vehicle and place her onto the ground to control her body."  He additionally noted, "Also, [supermarket] [s]ecurity wanted to get a photo as part of their process."

The arbitrator explained that "[w]hen questioned during the investigation, [Eason] acknowledged that he removed the [suspect] from the back seat of his police cruiser to enable the supermarket security to photograph her, pursuant to a practice of photographing larceny suspects, which officers know about and facilitate."  The city terminated Eason for "conduct unbecoming a police officer, untruthfulness, and falsifying records, based on the reason [he] reported for removal of the [suspect], expressed [as]:  'for her safety.'"  The city also asserted that there was no evidence that the suspect was thrashing in the cruiser.  Eason "acknowledge[d] that he removed the [suspect] to enable the store to photograph her, according to practice" and "also assert[ed] that the [suspect] had been out of control in the back of the car before she was removed, but not immediately prior to her removal.  [He] denie[d] that he lied, implicitly, because she was thrashing and they needed to photograph her, fairly simultaneously."

The arbitrator held that Eason's misconduct did not amount to just cause for termination, "a capital offense in the employment context." The arbitrator found that "the three words at issue were untrue, intentionally misleading, and cause for discipline, but less than intentionally <u>false</u>" (emphasis in original).[1] He also found that there was "persuasive evidence that the [suspect] acted up in the back before she was removed." The arbitrator held that the city failed to "persuade [him] that [Eason's] misconduct was so serious that it justified termination without prior, corrective discipline."

<u>Discussion</u>. A brief reminder of the history of labor arbitration is useful to put the discussion that follows in context. In 1935, Congress recognized that "the refusal by some employers to accept the procedure of collective bargaining lead[s] to strikes and other forms of industrial strife or unrest" and enacted the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169. 29 U.S.C. § 151. In pursuit of labor peace and "the free flow of . . . commerce," Congress declared it to be the policy of the United States to encourage collective bargaining. <u>Id</u>. See <u>National Labor Relations Bd</u>. v. <u>Allis-Chalmers Mfg. Co</u>., 388 U.S. 175, 180 (1967) ("National labor policy has been built on the premise that by pooling their

---

[1] The arbitrator also found that the statements were "knowingly inaccurate."

economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions").  To effectuate that policy, Congress established a framework for representation of private sector workers by a labor organization elected by the majority of employees.  Once that organization, often a union, was elected and certified as the employees' exclusive bargaining representative, it was a violation of law for an employer to refuse to bargain in good faith to reach a collective bargaining agreement.  29 U.S.C. § 158.

The NLRA, however, does not reach the bargaining relationship between workers and their public employers at the State and local level.  In 1973, the Legislature established an analog to the NLRA, G. L. c. 150E, governing bargaining between public employers and employees.  Similar to the NLRA,[2] G. L. c. 150E prohibits employers from refusing to bargain in good faith with elected employee representatives.

The Legislature further evinces its preference for the results of collective bargaining, including the outcome of arbitration, in G. L. c. 150E, § 7 (d), mandating that the terms

---

[2] We have long recognized the relationship between Congress's endorsed policy of collective bargaining and that of the Legislature's as embodied in G. L. c. 150E.  Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 562 n.2 (1981).

of collective bargaining agreements shall prevail over certain statutes governing myriad working conditions of public employees, including regulations promulgated by a police commissioner.  See id.; Boston v. Boston Police Patrolmen's Ass'n, 477 Mass. 434, 441 (2017) (Williams) (noting "courts' reluctance to allow [police commissioner's] broad discretionary powers to subsume bargained-for provisions").

1.  Standard of review.  The collective bargaining agreement between the city and the union, like many of its kind, contains a grievance procedure.  A delicate balance of both parties' concessions and demands yielded the city's promise to consider the union's grievances[3] through a process that, if necessary, culminates with arbitration.  In any collective bargaining context, it is the arbitrator's expertise that the parties bargained for.  United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 568 (1960).  The Legislature has indorsed, and we must respect, a strong public policy favoring arbitration.  School Comm. of Pittsfield v. United Educators of Pittsfield, 438 Mass. 753, 728 (2003) ("Public policy in the Commonwealth strongly encourages arbitration").  "Arbitration would have little value if it were merely an intermediate step

---

[3] The grievance process allows the union or, pursuant to G. L. c. 150E, individual employees to object to an action taken by the city that is governed by the collective bargaining agreement.  Such actions include, but are not limited to, the termination of employment, at issue here.

between a grievance and litigation in the courts." Id. The Legislature has codified this priority, permitting courts to vacate arbitration awards only in rare, statutorily enumerated circumstances. See G. L. c. 150C, § 11.

The system of collective bargaining created and indorsed by the Legislature necessitates deference to the bargained-for result of an arbitrator's award. We review the trial judge's decision to uphold the arbitration award de novo, but our examination of the underlying award is informed by the "strong public policy favoring arbitration" (citation omitted). See Bureau of Special Investigations v. Coalition of Pub. Safety, 430 Mass. 601, 603 (2000). However, the relationship between a reviewing court and the result of an arbitration is unlike the relationship between an appellate court and the outcome of a lower court's proceedings. Lynn v. Thompson, 435 Mass. 54, 61 (2001), cert. denied, 534 U.S. 1131 (2002). Our review of the underlying arbitration decision is considerably more deferential than even the abuse of discretion or clear error standards applied to lower court decisions. Id. See Williams, 477 Mass. at 439-440. Indeed, an arbitration award carries a presumption of propriety because it is the arbitrator's judgment, not necessarily an objectively correct answer, for which the parties have bargained. United Steelworkers of Am., 363 U.S. at 568.

We therefore "uphold an arbitrator's decision even where it is wrong on the facts or the law, and whether it is wise or foolish, clear or ambiguous." Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 818 (2005) (DiSciullo). "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." United Paperworks Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987) (Misco). Where the arbitrator allegedly engaged in "improvident, even silly, factfinding," we are nonetheless bound by those facts. Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001), quoting Misco, supra at 39. See Lynn, 435 Mass. at 62, quoting Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 665, 670 (11th Cir. 1988), cert. denied, 493 U.S. 871 (1989) ("An arbitrator's result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference"). An award cannot be disturbed even if an arbitrator's findings are so confusing or unclear that, in order to evaluate the merits of an award, we would have to confront conflicting inferences. See Misco, supra at 44 ("A refusal to enforce an award must rest on more than speculation or assumption," and it was "inappropriate" for lower court to infer

connection between arbitrator's facts and public policy at issue); Sheriff of Suffolk County v. Jail Officers & Employees of Suffolk County, 451 Mass. 698, 701-703 (2008) (arbitrator's factual findings were "far from a model of clarity" but "it would not be appropriate to vacate the arbitrator's award based on possibly incorrect factual inferences we might draw from his ambiguous findings").[4]

2.  Public policy exception.  Bound by the facts as explicitly found by the arbitrator, we evaluate the city's argument that public policy prohibits the enforcement of the arbitration award.  The city cites a public policy that requires police officers "to be truthful in all of their official dealings," which is necessary for "the police to gain and preserve the public trust [and] maintain public confidence" (citation omitted).  The city finds the root of this public

---

[4] Although we attempted to remand for clarification of facts in Sheriff of Suffolk County v. Jail Officers & Employees of Suffolk County, 451 Mass. 698, 702 n.5 (2008), remand was not possible due to the arbitrator's death, so we were left to wrestle with the facts as found.  See United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award.  To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions.  This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement" [footnote omitted]).

policy in G. L. c. 268, § 6A,[5] prohibiting "false written reports by public officers or employees."[6]

"[T]he judiciary must be cautious about overruling an arbitration award on the ground that it conflicts with public policy" (citation omitted). Bureau of Special Investigations, 430 Mass. at 604. "[W]e apply a stringent, three-part analysis" to determine whether the public policy exception applies to the otherwise mandated enforcement of an arbitration award (quotation and citation omitted). Williams, 477 Mass. at 442. "First, the policy at issue must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed

---

[5] "Whoever, being an officer or employee of the commonwealth or of any political subdivision thereof or of any authority created by the general court, in the course of his official duties executes, files or publishes any false written report, minutes or statement, knowing the same to be false in a material matter, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or by both such fine and imprisonment." G. L. c. 268, § 6A.

[6] The city also notes that in May, 2017, after Eason had been terminated, the district attorney for the Berkshire district sent the Pittsfield police chief a letter stating that he would not call Eason "to testify on behalf of the Commonwealth in any criminal matter, whether presently pending or in the future." Although very troubling, this was not part of the evidence considered by the city when firing Eason or by the arbitrator when making his decision. It therefore has no bearing on our consideration of the propriety of the arbitrator's decision. However, although it is required to abide by the results of this arbitration, the city is, of course, not prohibited from pursuing any additional appropriate discipline based on the district attorney's letter or any other newly acquired information.

public interests" (quotations and citation omitted). Id.
Second, the exception must not merely address "disfavored
conduct, in the abstract" but must target "disfavored conduct
which is integral to the performance of employment duties"
(emphasis in original). Id., quoting Massachusetts Highway
Dep't v. American Fed'n of State, County, & Mun. Employees,
Council 93, 420 Mass. 13, 16 (1995). Third, we inquire whether
an award reinstating the employee violates public policy.
Williams, supra at 442-443. The burden is on the party seeking
vacation of the award, the city, to demonstrate that the award
satisfies each of these prongs.[7] DiSciullo, 443 Mass. at 819.

We have already held that public policy supports
terminating police officers for lying and that such a public
policy satisfies the first two prongs. Id.[8] We turn our
attention to the third prong of this test, whether the award
violates public policy. It is crucial to note that "[t]he

---

[7] The city erroneously argues that "the burden ought to be
on the party arguing against the mandatory termination of an
officer who lies about a material matter in a police report to
proffer some authority for that position" (emphasis in
original). We decline to shift the burden from the party
seeking judicial intervention in the arbitration process.

[8] Unlike in Boston v. Boston Police Patrolmen's Ass'n, 443
Mass. 813, 819 (2005), the union here does not concede any
element of this test. The city and the union dispute whether
Eason's alleged misconduct constituted knowingly false
statements about a "material" matter in violation of G. L.
c. 268, § 6A. Neither party cites any authority for its
contention that the disputed aspect of the report was or was not
"material."

question in the third prong is not whether the employee's behavior violates public policy," but whether the award itself does. Williams, 477 Mass. at 442-443.

In the rare circumstances where Massachusetts reviewing courts have exercised the power to vacate an arbitration award on public policy grounds, there was no ambiguity in the material underlying factual findings. See Massachusetts Bay Transp. Auth. v. Boston Carmen's Union, Local 589, Amalgamated Transit Union, 454 Mass. 19, 24-26, 29-30 (2009) (arbitrator's award removing seniority from employee who won settlement as result of discrimination violated public policy); School Dist. of Beverly v. Geller, 435 Mass. 223, 224 (2001) (vacating arbitration award where arbitrator reinstated teacher who had used physical force against students); Boston v. Boston Police Patrolmen's Ass'n, 74 Mass. App. Ct. 379, 380-382 (2009) (reinstatement of officer who admitted to sufficient facts for assault by means of dangerous weapon when off duty and whose case was continued without finding violated public policy).

In DiSciullo, 443 Mass. at 814, which the city argues is controlling, we vacated an arbitrator's award reinstating an officer who was found to have behaved with "egregious dishonesty and abuse of [an] official position." In that case, DiSciullo filed an incident report and a statement of criminal charges falsely alleging disorderly conduct, assault and battery on a

police officer, and resisting arrest. Id. at 815. Thus, the factual findings established a clear nexus between the officer's dishonesty and the arrest and charges. Our decision to vacate the arbitrator's award in DiSciullo was based on our conclusion that the specific factual findings of the arbitrator concerning the officer's egregious dishonesty and abuse of official position mandated dismissal of the officer. Id. at 819-820. Here, the arbitrator's findings about Eason's misconduct do not describe conduct that rises to the level of misconduct that necessitated termination of the officer in DiSciullo. We cannot, in these circumstances, substitute our judgment for that of the arbitrator's in determining the appropriate discipline. See W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 765 (1983) ("Regardless of what our view might be of the correctness of [the arbitrator's] contractual interpretation, the Company and the Union bargained for that interpretation. A . . . court may not second-guess it").

In Sheriff of Suffolk County, 451 Mass. at 701, we considered an arbitrator's decision where "the factual findings . . . [were] far from a model of clarity." There, "the arbitrator concluded that [the jail officer] filed reports with the sheriff's internal investigation officers that were incomplete or false or misleading, but does not attempt to

distinguish among these three possibilities" (emphasis added).
Id. at 701-702. We stated that "[i]n a situation where a jail
officer actually witnesses fellow officers assault an individual
who is held in the sheriff's custody, and then lies about this
fact and files false reports that memorialize the falsity, we
have little doubt that established public policy would condemn
such conduct and would require the discharge of such an
officer." Id. at 702. In that case, therefore, there was a
nexus between the misconduct of the jail officer and the harm to
the prisoner. We concluded, however, that "the arbitrator's
findings [were] not sufficiently clear on what [the officer]
witnessed, or on the character of his reports and participation
in the sheriff's investigation -- that is, did he supply false
information, or was he simply less than complete?" Id. In
light of the "strong public policy . . . that favors
arbitration," we determined that "it would not be appropriate to
vacate the arbitrator's award based on possibly incorrect
factual inferences we might draw from his ambiguous findings."
Id. at 702-703.

In Williams, 477 Mass. at 436-437, 445, we were constrained
to approve the reinstatement of an officer who used a choke hold
on someone who "testified that he could not breathe and began to
lose consciousness," because the arbitrator found that the
officer did not use excessive force and was "not untruthful" in

reporting the incident. We held that it was not a violation of public policy to reinstate an officer who, as found by the arbitrator, did not use excessive force and did not lie. Id. at 445.

The distinction between a statement that is "intentionally misleading" but not "intentionally false" is, at best, elusive.[9] We need not dwell on the meaning of the arbitrator's factual findings, however, because the arbitrator found that the officer made a statement that was both "knowingly inaccurate" and "intentionally misleading" -- and this finding alone is sufficient to raise a question whether the arbitrator's award reinstating him is contrary to public policy. Undoubtedly, were we to conduct a de novo analysis we would not draw the same distinction between an "intentionally misleading" and an "intentionally false" statement, as did the arbitrator. See Williams, 477 Mass. at 444. See Misco, 484 U.S. at 38 ("an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them"). "The question . . . is not whether [Eason's] conduct justified termination, but whether it required termination, such that any lesser sanction would violate public policy" (emphasis in original). Williams, supra at 445. We have drawn the public policy

_____

[9] Logically, if a statement is not only "untrue" but also "knowingly inaccurate" and "intentionally misleading," it must also be "intentionally false."

exception quite narrowly because "[w]e cannot purport to encourage arbitration and yet devise ways to undermine an arbitrator's authority." School Dist. of Beverly, 435 Mass. at 248 (Cowin, J., dissenting). Obligated to credit the arbitrator's conclusion that a phrase in Eason's report was no more than misleading and that termination was not permissible under the collective bargaining agreement, we must uphold the award. See Concerned Minority Educators of Worcester v. School Comm. of Worcester, 392 Mass. 184, 187 (1984) ("we have no business overruling an arbitrator because we give a contract a different interpretation").

Our decision does nothing to limit the ability of police chiefs to terminate officers for lying where the arbitrator agrees that such conduct occurred. Nor does this decision change the public policy exception that bars the reinstatement of officers, as was the case in DiSciullo, whose lies have restricted other's liberty. Even a statement which is "intentionally misleading . . . but less than intentionally false" that resulted in arrest, prosecution, loss of liberty, or a violation of civil rights would justify, on public policy grounds, the decision of a police chief to terminate an officer.

General Laws c. 268, § 6A, which makes it a crime for a police officer in the course of his or her official duties to file or publish "any false written report, minutes[,] or

statement, knowing the same to be false in a material matter," and G. L. c. 268, § 13B, which makes it a crime for anyone to wilfully mislead another person who is a judge, prosecutor, or police officer "with the intent to impede, obstruct, delay, harm, punish or otherwise interfere thereby" with a criminal investigation or any criminal, juvenile, or civil proceeding "or do so with reckless disregard," reflect the Legislature's embrace of the important public policy interest that our police officers speak and act with integrity.[10]  Had Eason's wilfully misleading statement constituted a crime under § 13B, meaning that it was made with the intent to impede, obstruct, or otherwise interfere with a criminal investigation or any criminal, juvenile, or civil proceeding, then the third prong would have been met and public policy would have required that we set aside an award reinstating him.  But the suspect here was not charged with any conduct related to her removal from the police cruiser -- she was charged only with larceny, not with assault and battery on a police officer or disorderly conduct.  Therefore, the officer's "knowingly inaccurate" and "intentionally misleading" statement in his police report was not made with the intent to impede, obstruct, or otherwise

---

[10] In contrast with § 6A, a violation of § 13B does not require a knowing false statement; it suffices that the statement "directly or indirectly, willfully . . . misleads . . . another person."

interfere with any criminal investigation or proceeding; the arbitrator's factual findings indicate instead that the officer made this statement solely in an attempt to avoid discipline for removing the suspect from his police cruiser for the purpose of allowing supermarket personnel to photograph her.[11]

In making these employment decisions, police chiefs who are responsible for maintaining the integrity of their departments and for preserving public trust in their officers need clear lines. It requires commitment and courage for a police chief to terminate the employment of a police officer; it is generally easier to avoid doing so. Termination of an officer's employment means that the police department almost invariably will need to incur the expense of arbitration, including the substantial attorney's fees from litigating such an arbitration. And if the arbitrator disagrees with the decision to terminate, the officer will be reinstated and the police department will be required to make the officer whole with respect to lost benefits under the collective bargaining agreement, including back pay, compensation for lost income from overtime and details, and the return of seniority rights. If there are no clear public policy lines supporting termination, it is extremely difficult for a

---

[11] The arbitrator wrote, "I believe the [officer] wanted to conceal the real reason for removing the [suspect] by falsely reporting that it was safety-related . . . [and that] the [officer] referred to safety to deflect the readers of his report away from his bad judgment."

police chief to risk such a decision where it might be undone by an arbitrator whose decision cannot be reversed by a court even when it is plainly wrong as a matter of fact or as a matter of law.

Where a police chief decides to terminate an officer in circumstances in which the officer's false statements violated G. L. c. 268, § 6A or 13B, or which otherwise resulted in an unjustified arrest or prosecution, or in a deprivation of liberty or denial of civil rights, an arbitration award finding no just cause for such a dismissal and reinstating the officer would violate public policy. We affirm the arbitrator's award here only because it did not cross this public policy line.

Judgment affirmed.