## CITY OF BOSTON *vs.* BOSTON POLICE PATROLMEN'S ASSOCIATION.

Suffolk. December 6, 2004. - April 4, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Arbitration,* Collective bargaining, Police, Vacating award. *Public Policy.*
*Public Employment,* Police, Collective bargaining, Termination.

This court vacated an arbitrator's award requiring the plaintiff to rescind its
termination of a police officer and instead suspend the officer for one year
without pay, where the arbitrator's findings that the officer had falsely ar-
rested two individuals on misdemeanor and felony charges, lied in sworn
testimony and over a period of two years about his official conduct, and
knowingly and intentionally squandered the resources of the criminal
justice system on false pretexts, were grounds for the officer's dismissal,
and a lesser sanction would offend public policy against the kind of
egregious dishonesty and abuse of official position in which he was proved
to have engaged. [818-823]

CIVIL ACTION commenced in the Superior Court Department on
March 16, 2000.

The case was heard by *Carol S. Ball,* J., on motions for sum-
mary judgment.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Kerri E. Tierney,* Special Assistant Corporation Counsel, for
the plaintiff.

*John M. Becker* for the defendant.

The following submitted briefs for amici curiae:

*Philip Collins & Daniel C. Brown,* for Massachusetts
Municipal Association & another.

*John M. Collins,* for Massachusetts Chiefs of Police Associa-
tion, Inc.

MARSHALL, C.J. This case presents one of those "rare
instances" in which an arbitrator's award must be vacated as
contrary to "an explicit, well-defined, and dominant public
policy." *Eastern Associated Coal Corp.* v. *United Mine Workers,*

*Dist. 17*, 531 U.S. 57, 62, 63 (2000). See *Lynn* v. *Thompson*, 435 Mass. 54 (2001), cert. denied, 534 U.S. 1131 (2002). The arbitrator, chosen by mutual agreement of the Boston Police Patrolmen's Association (association) and the city of Boston (city) pursuant to a collective bargaining agreement, required the city to rescind its termination of John DiSciullo, a police officer.[1] The arbitrator, concluding that DiSciullo, while on duty, had engaged in "egregious" and "outrageous" "misconduct" toward two civilians and that his subsequent reports of the incident over a two-year period demonstrated that he was "lacking" in both "integrity and trust," nevertheless determined that DiSciullo's actions warranted a one-year suspension without pay, rather than termination. On cross motions for summary judgment, a Superior Court judge affirmed the award, as did the Appeals Court. *Boston* v. *Boston Police Patrolmen's Ass'n*, 60 Mass. App. Ct. 920 (2004). We granted the city's application for further appellate review. As we explain below, because DiSciullo's continued employment as a police officer would frustrate strong public policy against the kind of egregious dishonesty and abuse of official position in which he was proved to have engaged, we vacate the arbitrator's award.

1. *Background.* We summarize the arbitrator's factual findings. In the early morning of August 30, 1997, DiSciullo and Officer John Johnson ·were driving the wrong way down Shawmut Avenue in Boston in their cruisers, after answering a call concerning a rowdy party. DiSciullo, in the lead car, pulled alongside a double-parked automobile. Inside the vehicle were four adults, including Jonathan Rodriguez, in the front passenger seat, and his wife, Yadira Caminero, in the back. DiSciullo asked the driver how long he intended to keep his automobile double parked, and Rodriguez responded. What happened next is disputed, but in the arbitrator's words, "the incident devolved into the mess that followed . . . due entirely to DiSciullo's demeaning attitude" toward the couple.[2] There is no dispute that, at one point during

---

[1] We acknowledge amicus briefs filed by the Massachusetts Chiefs of Police Association, Inc., the Massachusetts Municipal Association, and the city of Cambridge.

[2] None of the other occupants of the car in which Rodriguez was a pass-

the incident, DiSciullo referred to Caminero as a "bitch." The arbitrator also found that DiSciullo was "impatient, harsh and derisive towards Rodriguez from the beginning of the encounter." The altercation on Shawmut Avenue ended when DiSciullo placed Rodriguez and Caminero under arrest for disorderly conduct. He testified that he transported them to the police station, where he handcuffed Rodriguez to the wall. At some point, DiSciullo "headed straight for" the handcuffed Rodriguez and threatened him in front of a police sergeant, saying, "I'm going to take you out back and straighten you out." A sergeant on duty at the time testified that he was forced to restrain DiSciullo physically and pull him into a supervisor's office.

To support the arrests, DiSciullo filed an incident report and a statement of criminal charges alleging disorderly conduct, assault and battery on a police officer, and resisting arrest.[3] Among other things, the incident report stated that DiSciullo was repeatedly assaulted on the arms and torso by Rodriguez and Caminero and suffered resulting pain in his arm and right shoulder. The arbitrator determined that both DiSciullo's incident report and the statement of criminal charges were "knowingly untrue." On November 10, 1997, an assistant district attorney for Suffolk County entered a nolle prosequi in the criminal matters against Rodriguez and Caminero because, in his words, "the Commonwealth does not have competent or credible evidence to further prosecute these defendants for the charges pending" and dismissal of the charges would advance "the interests of justice."

A Boston police department (department) internal affairs investigation of the incident commenced on September 2, 1997. On January 25, 1999, after an internal affairs division hearing,

_____

enger on the night of the incident testified at the arbitration hearing. Rodriguez filed a civil suit in Federal District Court against DiSciullo, the disposition of which is unclear from the record. The arbitrator found that much of Rodriguez's testimony, as well as that of DiSciullo, was tainted by self-interest, and she drew her factual conclusions principally from accounts of events that were corroborated from the testimony of unbiased witnesses.

[3]Johnson testified at the arbitration hearing that he specifically requested that he not be named in the incident report, an account supported by DiSciullo's testimony that Johnson failed to assist him during the incident.

DiSciullo was found to have violated all sixteen "specifications," or disciplinary charges, that the department had brought against him.[4] While the investigation and hearing were pending, the department placed DiSciullo on paid administrative leave, pursuant to a provision in the collective bargaining agreement that allows the department to suspend officers "unfit for duty."[5] Subsequent to the hearing, on March 4, 1999, the department discharged DiSciullo as a police officer. The arbitrator determined that DiSciullo "carried forward his deliberately distorted version of the event" during the department's internal investigation.

DiSciullo sought an arbitrator's review of the departmental action pursuant to the collective bargaining agreement between the association and the city.[6] The arbitrator characterized DiSciullo's sworn arbitration testimony as "implausible," "unconvincing," "deliberately distorted," "pure wishful thinking," "totally disingenuous," and "transparently phony." She specifically found that DiSciullo had "threatened Jonathan Rodriguez," "behaved disrespectfully, discourteously and inconsid-

---

[4]The charges brought against DiSciullo constituted sixteen separate violations of rules and procedures of the Boston police department and of statutes, including rule 102, §§ 3 (conduct unbecoming), 8 (directives and orders), 9 (respectful treatment), 23 (departmental reports — truthfulness), 27 (abuse of process) and 35 (conformance to laws), and G. L. c. 275, §§ 2 and 4. The specific charges included assaulting and beating Jonathan Rodriguez and Yadira Caminero, threatening Rodriguez and Caminero, using racial epithets, behaving disrespectfully to members of the public, failing to obey orders, falsifying a department report, manufacturing and withholding evidence, and filing false criminal charges. The arbitrator's factual findings largely were consistent with the department's, but the arbitrator found insufficient basis to determine that DiSciullo had threatened Caminero or used racial epithets. In addition, even though DiSciullo had exclaimed to a fellow officer at the scene that he had "put [his] hands on" Rodriguez and Caminero, the arbitrator found that the evidence was "not sufficiently clear so as to find the officer guilty of [assault]." The arbitrator also disagreed with the department's finding that DiSciullo knowingly had disobeyed orders when he threatened Rodriguez at the police station, relying on the evidence of an unbiased witness that DiSciullo was "so caught up in the moment" that he might not have heard his superior's order to leave Rodriguez alone.

[5]Administrative leave status permitted DiSciullo to continue to draw his salary but denied him overtime detail and other remunerative opportunities.

[6]The principal issue to be decided, as jointly submitted by the parties, was whether "there [was] just cause for the discharge of Officer John DiSciullo? If not, what should be the remedy?"

erately" toward Rodriguez and Caminero, "knowing[ly] entered inaccurate, false and incomplete information in a [d]epartment report," and "made false accusations of criminal charges against Rodriguez and Caminero," in violation of departmental rule 102, §§ 3, 9, 23, 27, and 35. See note 4, *supra.* "He caused," in her words, "a small issue over a parking violation to explode into an episode of public embarrassment, frustration and legal headache for a couple who made the mistake of lingering in a double-parked car too long." The arbitrator, however, did not credit the charges that DiSciullo used excessive or improper force against either Rodriguez or Caminero. She declined to determine whether DiSciullo's conduct, which she characterized as "extreme" and "bizarre," violated any statutory provision, on the ground that the issue was not separately argued by the parties.

On the subject of penalties, the arbitrator determined that termination was too harsh a sanction for DiSciullo, in light of evidence offered by the association that, under the department's current and immediate past leadership, police officers found to have engaged in similar or more serious misconduct had received penalties short of termination. She reasoned that suspending DiSciullo without pay for one full year would sufficiently "impart the message that officers must be held to the highest standards of integrity and professionalism."

The city brought suit in the Superior Court under G. L. c. 150C, § 11 (*a*) (3), claiming that the arbitrator had exceeded her authority by construing the collective bargaining agreement in a manner that violated public policy.[7] A Superior Court judge denied the city's motion for summary judgment, and allowed the association's motion for summary judgment to confirm the arbitration award. The Appeals Court affirmed, "albeit with a distinct lack of enthusiasm," based on its reading of controlling precedent. *Boston* v. *Boston Police Patrolmen's Ass'n*, 60 Mass. App. Ct. 920, 922 (2004).

---

[7]General Laws c. 150C, § 11, provides in relevant part that a Superior Court judge may vacate an arbitration award "procured by corruption, fraud or other undue means" or if "there was evident partiality by an arbitrator appointed as a neutral, or corruption . . . or misconduct," or if "the arbitrators exceeded their powers."

2. *Discussion.* When parties agree to arbitrate a dispute, courts accord their election great weight. The strong public policy favoring arbitration requires us to uphold an arbitrator's decision even where it is wrong on the facts or the law, and whether it is wise or foolish, clear or ambiguous. See *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. 1006, 1007 (1990), and cases cited. Our deference to the parties' choice of arbitration to resolve their disputes is especially pronounced where that choice forms part of a collective bargaining agreement. *School Dist. of Beverly* v. *Geller*, 435 Mass. 223, 229 (2001) (Cordy, J., concurring). In such cases, the Legislature has severely limited the grounds for vacating arbitration awards. See G. L. c. 150C, § 11. See also *School Comm. of Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. 753, 758 (2003) ("Arbitration has long been viewed as a particularly appropriate and effective means to resolve labor disputes"). But extreme deference to the parties' choice of arbitration does not require us to turn a blind eye to an arbitration decision that itself violates the law. We do not permit an arbitrator to order a party to engage in an action that offends strong public policy. See *Lynn* v. *Thompson*, 435 Mass. 54, 61 (2001); *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, *supra.* See G. L. c. 150C, § 11 (*a*) (3) (Superior Court judge "shall" vacate arbitration award where "the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law").

" '[T]he question of public policy is ultimately one for resolution by the courts' and not by arbitrators." *Bureau of Special Investigations* v. *Coalition of Pub. Safety*, 430 Mass. 601, 603 (2000), quoting *Massachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93*, 420 Mass. 13, 16 n.5 (1995). We apply a stringent, three-part analysis to establish whether the narrow public policy exception requires us to vacate the arbitrator's decision:

"To meet the criteria for application of the public policy exception, the public policy in question 'must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' *Mas-*

*sachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93, supra* at 16. . . . 'The public policy exception does not address "disfavored conduct, in the abstract, but [only] disfavored conduct which is *integral to the performance of employment duties* . . . ." ' *Id.* at 17 . . . . 'Finally, we require[] a showing that the arbitrator's award reinstating the employee violates public policy to such an extent that the employee's conduct would have required dismissal.' *Bureau of Special Investigations* v. *Coalition of Pub. Safety, supra* at 605. . . ."

*Lynn* v. *Thompson, supra* at 62-63.

In this case, the parties do not disagree that DiSciullo's misconduct, as determined by the arbitrator, satisfies the first two prongs of our test. To prevail, the city must therefore demonstrate that public policy requires that DiSciullo's conduct, as found by the arbitrator, is grounds for dismissal, and that a lesser sanction would frustrate public policy. *Id.* at 63. *Bureau of Special Investigations* v. *Coalition of Pub. Safety, supra.* "The question to be answered is not whether [DiSciullo's conduct] itself violates public policy, but whether the agreement to reinstate him does so." *Eastern Associated Coal Corp.* v. *United Mine Workers, Dist. 17,* 531 U.S. 57, 62-63 (2000). "If an award is permissible, even if not optimal for the furtherance of public policy goals, it must be upheld." *Massachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93, supra* at 19.

Given the arbitrator's findings that DiSciullo had falsely arrested two individuals on misdemeanor and felony charges, lied in sworn testimony and over a period of two years about his official conduct, and knowingly and intentionally squandered the resources of the criminal justice system on false pretexts, an agreement to reinstate DiSciullo would offend public policy. "One of the most important police functions is to create and maintain a feeling of security in communities. To that end, it is extremely important for the police to gain and preserve public trust, maintain public confidence, and avoid an abuse of power by law enforcement officials." *Clancy* v. *McCabe,* 441 Mass. 311, 328 (2004) (Ireland, J., dissenting). "The image presented

by police personnel to the general public . . . 'also permeates other aspects of the criminal justice system and impacts its overall success.' " *Civil Serv. Comm'n* v. *Johnson*, 653 N.W.2d 533, 538 (Iowa 2002), quoting *Fort Dodge* v. *Civil Serv. Comm'n*, 562 N.W.2d 438, 440 (Iowa Ct. App. 1997).

A police officer who uses his position of authority to make false arrests and to file false charges, and then shrouds his own misconduct in an extended web of lies and perjured testimony, corrodes the public's confidence in its police force. There is no dearth of positive law expressing the Legislature's strong instruction that such individuals not be entrusted with the formidable authority of police officers. General Laws c. 41, § 96A, for example, provides: "No person who has been convicted of any felony shall be appointed as a police officer of a city, town or district." See G. L. c. 268, § 1 (criminal offense of perjury, which in this case applies to DiSciullo's swearing to false criminal charges and testifying falsely under oath). See also G. L. c. 268, § 6A (criminalizing false police reports); G. L. c. 265, § 37 (crime for person acting under color of law to violate or interfere with constitutional rights)[8]; *Cambridge* v. *Civil Serv. Comm'n*, 43 Mass. App. Ct. 300 (1997) (upholding decision of personnel administrator to authorize bypass of otherwise qualified candidate for police officer position based on her prior false testimony under oath and involvement in domestic violence dispute several years prior to her eligibility for appointment). That DiSciullo has not been convicted of any felony and that the arbitrator did not credit the assault and battery charges against him are, contrary to the association's assertion, beside the point. There is no question that DiSciullo lied under oath, in the criminal complaints against Rodriguez and Caminero and at the arbitration hearing, if not elsewhere. It is the felonious misconduct, not a conviction of it, that is determinative. For an arbitration award to violate public policy, it need not violate the letter of a statute. See *Eastern Associated Coal Corp.* v. *United Mine Workers, Dist. 17, supra* at 63

_____

[8]For the criminal liability of police officers engaging in such felonious conduct, see, e.g., *Commonwealth* v. *Luna*, 418 Mass. 749 (1994) (affirming convictions of perjury and filing false police reports of officer on account of his false affidavit in support of search warrant).

("courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law"). We fail to see how exoneration of some felonious conduct cleanses or mitigates other felonious conduct. DiSciullo committed his serious breaches of the law while on the job and presuming to carry out his duties. The Legislature has forbidden persons found to have engaged in such conduct from becoming police officers and, by implication, from remaining police officers. Here, DiSciullo's misconduct could not have been committed but for the authority vested in him as a police officer. His actions thus go "to the heart of [his] responsibilities." *Massachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93, supra* at 17, quoting *United States Postal Serv.* v. *American Postal Workers Union,* 736 F.2d 822, 823, 825 (1st Cir. 1984). Cf. *Lynn* v. *Thompson, supra* (reinstatement proper where charges of using excessive force not proved); *Massachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93, supra* (arbitration award upheld if employee's harmful conduct not related to job activities).

We note that, in addition to the above statutes, the Legislature specifically has mandated that commissioners of police of Boston take all necessary actions to uphold the probity of officers under their command and, where necessary, punish misconduct and terminate officers' employment. See St. 1962, c. 322, § 1, amending St. 1906, c. 291, § 11 (police commissioner of Boston "shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force"). Pursuant to his statutory authority, the commissioner had issued clear, explicit regulations against the very misconduct in which DiSciullo engaged. See note 4, *supra.* The cumulative message of these regulations is clear: police officers themselves must obey the law and be truthful in all of their official dealings, or they may face termination. See, e.g., rule 102, § 35 ("An employee of the [d]epartment who commits any criminal act shall be subject to disciplinary action up to and including discharge from the [d]epartment. Each case shall be considered on its own merits, and the circumstances of each shall be fully reviewed before the final action is taken"). If anything, DiSciul-

lo's status as an officer with what the arbitrator characterized as a "ten-year history [as a police officer] in racially diverse areas of the city" makes his conduct more offensive rather than, as the association claims, less so.[9]

We find additional evidence that DiSciullo's proved misconduct requires (rather than merely permits) dismissal in the agreement itself. Article VI, § 5, of the agreement provides that arbitration decisions will be "final and binding," except for decisions that "amend[], add[] to or detract[]" from the agreement, or that "modif[y] or abridge[] the rights and prerogatives of municipal management under Article V." Article V states that the city and the commissioner "reserve[] and retain[] the regular and customary rights and prerogatives of municipal management." Although the agreement itself does not specify the "rights and prerogatives" to which it alludes, they must surely encompass the commissioner's statutory obligations to establish and enforce disciplinary policies, including the sanction of termination, for misconduct that will raise doubts in the community about a police officer's evenhanded application of the law and the veracity of his sworn testimony.[10] This is not merely a case where an officer was fired for felonious conduct;

---

[9]In partial mitigation of DiSciullo's conduct, the arbitrator noted that he had "no history of misconduct of this nature" in his ten years on the police force. The arbitrator's other two grounds for reinstatement were that two of the most serious charges against DiSciullo — assault and battery on Rodriguez and Caminero — had not been proved, and that the department had meted out lesser sanctions to others for misconduct at least as egregious as DiSciullo's. That other police officers may have received lesser sanctions for their serious misconduct avails nothing here. Each case must be judged on its own facts, and the factual record in those cases is not before us. In any event, there is no suggestion that the reasons for DiSciullo's termination were pretexts or motivated by improper considerations. Nor do we credit the association's argument that the prior dispositions worked an estoppel of the department's termination in this case. Leniency toward egregious police misconduct in the past (assuming such leniency occurred) cannot lead a police officer to commit reprehensible actions in the expectation that he will receive a light punishment.

[10]Reported cases from other jurisdictions show that courts consistently have refused to enforce arbitration awards reinstating public safety officials who have been found to have abused their power illegally and to the detriment of those they are entrusted to protect. See, e.g., *South Windsor* v. *South Windsor Police Union*, 41 Conn. App. 649 (1996) (police officer deliberately revealed identity of confidential informant); *Chicago Fire Fighters Union Local No. 2* v. *Chicago*, 323 Ill. App. 3d 168 (2001) (fire fighters found to have been intoxicated while on duty). See also *State* v. *American Fed'n of State, County*

this is also a case where an officer was fired for feloniously abusing his position. The association characterizes DiSciullo's misconduct as "a one-time first offense that occurred on a single night." But the arbitrator found that DiSciullo's final two years on the police force had been spent carrying out a "charade of innocence" in a "calculated effort to cover his tracks."

The public policy against requiring the reinstatement of police officers who have committed felonious misconduct stems from the necessity that the criminal justice system appear legitimate to the people it serves. People will not trust the police — on the street or in court — unless they are confident that police officers are genuine in their determination to uphold the law. As the city reminds us, police legitimacy would be damaged severely by reports that the city continued to employ a police officer who had illegally abused his power and repeatedly lied about it under oath. Indeed, DiSciullo's involvement in an investigation could prejudice the public against an otherwise flawless criminal prosecution.

Although arbitration decisions are given great deference, they are not sacrosanct. Here we cannot say that the strong public policy favoring arbitration should trump the strong (and in our view, stronger) public policy, "explicit, well-defined, and dominant," *Eastern Associated Coal Corp.* v. *United Mine Workers, Dist. 17*, 531 U.S. 57, 63 (2000), that police officers be truthful and obey the law in the performance of their official duties.

3. *Conclusion.* For the reasons stated above, we vacate the arbitrator's award and the grant of summary judgment in favor of the association, and reverse the denial of the city's motion for summary judgment. We remand the case to the Superior Court for entry of judgment in favor of the city and further proceedings consistent with this opinion.

*So ordered.*

& *Mun. Employees, Council 4, Local 387*, 252 Conn. 467 (2000) (correctional officer, while on duty, used State-owned telephone to place obscene call to State senator).