SUPERIOR COURT 
 
 BOSTON SCHOOL COMMITTEE v. BOSTON TEACHERS UNION

 
 Docket:
 2384CV00525 / 2384CV01555
 
 
 Dates:
 March 27, 2024
 
 
 Present:
 Robert B Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON THE PARTIES' CROSS-MOTIONS FOR. JUDGMENT ON THE PLEADINGS
 
 

 
            In these consolidated actions, Plaintiff Boston School committee (..Plaintiff' or the "Committee") seeks to vacate two arbitration awards ordering the reinstatement of paraprofessionals Sherika Alford and Angela O'Neil (collectively, the "Grievants"), respectively. Before the Court are the parties' cross-motions for judgment n the pleadings. For the reasons which follow, Plaintiff's Motion shall be DENIED and Defendant's Motion shall be ALLOWED.
FACTUAL BACKGROUND[1]
I. Collective Bargaining Agreement
            The Committee represents le Boston Public Schools ("BPS") in collective bargaining. Defendant Boston Teachers Union (..Defendant" or the ..Union ") represents BPS teachers and paraprofessionals, including the Grievants. The Committee and the Union are parties to a collective bargaining agreement (the "CBA"), which contract remained in full force and effect at
 
---------------------------------------
 
[1] The following factual background is drawn from the findings of fact set forth in the underlying arbitration decisions. See Pittsfield v. Local 447 Int'l Bhd. of Police Officers, 480 Mass. 634, 638 (2018), citing Major League Baseball Players Ass'n v. Garvey. 532 u:s.504, 509 (2001) (court is bound by arbitrator's fact findings).
 
                                                                        -1-
 
all times relevant hereto. The CBA contained the following provisions concerning the termination of paraprofessionals:
            Art. II, ' A(9): Just Cause
Paraprofessionals who have completed their probationary period shall not be disciplined or discharged without just cause.
            Art. VIII, ' 0(9): AWOL
If a teacher or paraprofessional is AWOL for more than 15 days, this constitutes just cause for termination.
(Pl.'s Compl. No. 2384CV01555, Ex. A. O'Neil Dec., at 2.) The relevant BPS Sick Leave Policy further provided that an employee who is absent for six days or more must provide a physician's
certificate stating the anticipated duration of the employee's incapacity, the anticipated date of the employee's return to work, or the date when the employee expects to see a physician for
reevaluation. (Id. at 2-3.)

            The CBA limited arbitration to disputes "involv[ing] the meaning, interpretation, or application of an express provision of [the] Agreement," and provided that "[t]he arbitrator shall have no power  to alter, add to, subtract from, or modify any provision ....” (Id..at 2, Art. V, ' E(2).)Further, the Committee and Union agreed in the CBA that the decision of an arbitrator would be final and apply prospectively ''to all similar situations." (ld., Art. V, ' E(3),(4).)
II. Alford Award
            Ms. Alford worked for BPS for 18 years as a substitute teacher, guidance counselor, community field coordinator, and paraprofessional. In 2019, she was assigned as a paraprofessional to a kindergarten class at Dante Alighieri Montessori School. Ms. Alford took sick leave during the week of September 20-27, 2021, due to suspected COVID. Her brother and sister had tested positive for COVID, and she had recently been with them. Ms.
 
                                                                        -2-
 
Alford contacted the school every day that week concerning her status. On September 24, 2021, the school principal inquired whether she would be returning to work the following week. Ms. Alford responded that she would not, and that she intended to seek a leave of absence. Ultimately, Ms. Alford's brother and sister were hospitalized, and her sister was placed on a ventilator. In addition to her own two children, Ms. Alford cared for her brother's child until October, 2021, and her sister's three children until November, 2021.
            On September 27 and October 1,2021, Ms. Alford applied for sick leave through November 1, 2021.[2] On October 4,12021, the BPS Office of Human Capital (OHC) requested that Ms. Alford submit medical documentation substantiating her absence by October 16, 2021. Otherwise, BPS would consider Ms. Alford AWOL for the period after September 27, 2021, and proceed with her dismissal. The notice also informed Ms. Alford of her right to a Loudermill[3] hearing with the principal on October 26, 2021.        .
            Ms. Alford developed high blood pressure while caring for her siblings' children, and was placed on medication. She notified OHC on October 15, 021 that the earliest doctor's appointment she was able to obtain was November 1, 2021. Ms. Alford attempted to obtain a note from her sister's physician to support her leave request, but this was denied because Ms. Alford was not a patient. Historically, BPS had been flexible with medical documentation deadlines, particularly when employees experienced difficulty seeing medical providers during the pandemic.
            Ms. Alford elected to forego the Loudermill hearing on October 26, 2021, and BPS
 
---------------------------------------
 
[2] BPS apparently did not receive the September 27 request, and notified Ms. Alford on October 1 that she was considered AWOL. This prompted Ms. Alford to resubmit her leave application that day.
[3]Loudermill v. Cleveland Bd. of Educ., 470 U.S. 532 (1985) (holding that due process requires that certain public employees have a right to a pre-termination hearing to contest whether reasonable grounds exist for dismissal).
 
                                                                        -3-
 

notified her that day that her leave request was denied due to I ck of supporting medical documentation. Ms. Alford then attended her scheduled medical appointment on November 1, 2021, and her treating physician provided a letter advising he to remain out of work through November 16, 2021. Ms. Alford emailed this letter to BPS from the parking lot of her physician's office. However, that same day, BPS transmitted her a "Resignation of Employment" notice, deeming her to have voluntarily resigned (effective October 16, 2021) because she had been absent without approval since September 27, 2021.
            The Union pursued a grievance and arbitration on be f of Ms. Alford, and a hearing was held before Arbitrator Eileen Cenci. On October 14, 2 22, Arbitrator Cenci found that BPS lacked just cause to discharge Ms. Alford or classify her absence as a voluntary resignation, and thus ordered that BPS reinstate her to active employment. Arbitrator Cenci acknowledged that Ms. Alford did not act in an "exemplary fashion," in that he did not attend the Loudermill hearing, did not provide medical documentation by the October 16 deadline, and ultimately provided a doctor's note that was prospective only and did not address her absence from work between September 27 and November 1, 2021. (PI.'s Compl. No. 2384CV00525, Ex. A, Alford Decision, at 11.) Arbitrator Cenci nevertheless concluded that the CBA's fifteen-day AWOL provision could not "be applied in a mechanical or formulaic fashion," and, that an "employee must be correctly designated as AWOL in order for the provision to apply."(Id.) She reasoned:
"There can be no doubt that the grievant's absences were characterized as AWOL by [BPS], and that she had been AWOL for more than fifteen days by their calculation. There is, however, a question as to whether AWOL was the appropriate designation for the grievant's absences after September 27, 2021. The term 'AWOL', when used to justify dismissal, generally refers to situations where the employee has abandoned his or her job, and has made no attempt to communicate with the employer."
(Id. at 10.) That was not the case here, as Ms. Alford had "clearly communicated to both her school principal and OHC that she intended to take a leave of absence through November 1,
 
                                                                        -4-
 
2021 and then return to work." (Id.) Specifically, Ms. Alford informed the school principal of her intent to seek sick leave, applied for such leave, notified her employer prior to its October 16
deadline of the difficulty she had encountered obtaining a medical appointment, and, upon receipt of her doctor's letter, immediately submitted it to BPS. Arbitrator Cenci further noted that, in a departure from its prior practice, BPS had not extended Ms.Alford any leeway in the time it allowed her to secure a doctor's appointment during the pandemic. Instead, BPS simply terminated Ms. Alford's employment on AWOL grounds without considering her medical documentation.
III. O'Neil Award

            Ms.  O'Neil worked as a paraprofessional in the BPS system beginning in 2015, and at the Curley School beginning in the Fall of 2016. On May 27,202  , Ms. O'Neil witnessed an autistic student physically attack another paraprofessional, and she helped restrain the student. The incident led to a verbal confrontation between Ms. O'Neil an the student's lead teacher. The lead teacher alleged that Ms.O'Neil had threatened to fight her. According to Ms. O'Neil, the lead teacher had raised similarly false, and racially charged, accusations against her in 2019. Following this incident, Ms. O'Neil took sick leave for the last month of the school year. In June and July, 2021, Ms. O'Neil filed complaints of discrimination with the BPS Office of Equity and the Massachusetts Commission Against Discrimination (MCAD) concerning the lead teacher's allegations. At an internal meeting held in June, 2021, Ms. O'Neil also expressed to the Office of Equity and other BPS administrators and staff that she felt"emotionally broken," was not sleeping, was receiving therapy treatment once per week, and was afraid to return to the Curley School.
            Ms. O'Neil did not return to work when school resumed in September, 2021. At that
 
                                                                        -5-
 
time, she was receiving treatment and taking prescription medication for depression, anxiety, isolation, and sleep disorder. Ms. O'Neil initially used accrued sick leave and then, on September 15, 2021, applied for a medical leave of absence from September 7 to December 7, 2021. Ms. O'Neil included in her leave application a letter from her treating physician, Erika Line-Nitu, D.O. of Bowdoin Street Health Center, certifying that she had been diagnosed with acute stress disorder, psychosocial stress and insomnia, and that she would be incapacitated for at least three months. BPS approved Ms. O'Neil leave application on October 4, 2021. On October 12 and again on November  22, 2021, the OHC notified Ms. O'Neil that she either needed to notify BPS two weeks prior to her December 7 return date whether she intended to return to work, extend her leave of absence, or voluntarily resign.
            MCAD initially scheduled a meeting with Ms. O' Neil and BPS to address the discrimination complaint on December 1, 2021. However, this meeting was postponed to February 9, 2022. On December 10 2021, Ms. O'Neil emailed the OHC, stating that she had not previously reported her post-leave intentions because she believed the MCAD meeting would address her request to be transferred out of the Curley School prior to her return date. The OHC responded that day that, since Ms. O'Neil's leave had expired and she did not have a pending request for an extension or alternate accommodation, she was considered AWOL. However, the OHC noted that, if she requested a reasonable accommodation, BPS would pause the AWOL process and consider the request on its merits. BPS also called upon Ms. O'Neil to provide current medical documentation by January 3, 2022, justifying her continued absence, failing which she would be subject to dismissal. Ms. O'Neil replied that she had been requesting an accommodation from BPS since June, in the form of a transfer from the Curley School. She also notified BPS that she would be providing a letter from her clinical social worker.
 
                                                                        -6-
 
            On December 14, 2021, Jasmine Welcome, LICSW, of Bowdoin Street Health Center, wrote to the OHC that she had been treating Ms. O'Neil for six months and recommended that she not return to the Curley School. The OHC responded to Ms. O'Neil two days later, asserting that the letter was insufficient because Ms. Welcome was not treating physician. Ms. O' Neil responded that she was on the verge of hospitalization, and that she had not gone AWOL. On December 24, 2021, Ms. O'Neil submitted a letter from Dr. Line-Nitu, stating that Ms. O'Neil should not return to the Curley School and that her condition required regular evaluations. On December 27, 2021, the OHC responded that this note was insufficient, because it did not indicate Ms. O'Neil's specific date of incapacity. Ms. O'Neil emailed the OHC that day that she was entering an adult partial hospitalization on January 3, 2022. The OHC reiterated that, without a leave extension supported by medical documentation , BPS would consider her AWOL.

            On January 3, 2022, Dr. Line-Nitu wrote that Ms. O'Neil’s" acute condition started on June 3,2021," that she would "attend an inpatient hospitalization program starting January 7, 2022," and that she "will be seen after her hospitalization."(O'Neil Dec., at 13.) After entering in-patient treatment, Ms. O'Neil generally ceased checking her email, in accordance with her clinician's recommendation. On January 12,2022, in response to BPS's notice of a Loudermill hearing the following day, Ms. O'Neil's attorney contacted the OHC and expressed concerns regarding BPS's treatment of Ms. O'Neil (including her unanswered requests for accommodation). There is no indication that a Loudermill hearing was held.
            On January 25, 2022, the OHC Notified Ms. O’Neil by email and certified mail that Dr. Line-Nitu' s letter remained insufficient, because it did not indicate an end date of incapacity or a date of reevaluation. BPS gave Ms..O'Neil until February 9, 2022 to provide such information. Ms. O'Neil did not respond. On March 25, 2022, BPS discharged Ms. O'Neil from employment
 
                                                                        -7-
 
for being absent without proper notice or documentation since December 7, 2021. Ms. O'Neil was partially hospitalized (attending five therapy sessions, five days per week) from January 7 to March 4, 2022, and continued intensive outpatient care through at least May, 2022.
            The Union pursued a grievance and arbitration on Ms. Neil's behalf, and hearing was held before Arbitrator Mary Jeanne Tufano on January 11 and 23, 2023. On June 12, 2023, Arbitrator Tufano issued her decision that BPS had discharged Ms. O'Neil without just cause, and ordered that she be reinstated to active employment. Arbitrator Tufano acknowledged that Ms. O'Neil had been absent for mole than 15 days, without approved leave, but nevertheless reasoned:
"It is clear from the evidence that the parties did not intend [the AWOL] provision to preclude consideration of mitigating factors, based on the School District' s procedures and the fact that [it]delayed Ms. O'Neil's termination for more than three months after the expiration of [her] leave of absence."
(Id. at 19.) The arbitrator further noted, "this is not a case where an employee abandoned their job for an extended period of time without notice[.]" .(Id. at 21) To the contrary, Arbitrator Tufano found that Ms. O'Neil was already on approved leave through December 7, 2021; she
I           .
maintained an "extensive amount of communication" with BP concerning her condition; she
 
repeatedly attempted to provide the documentation requested of her; her mental health crisis likely compromised her ability to comply strictly with BPS's documentation requirements; BPS was aware of her hospitalization when it discharged her; and BPS's only stated objection to the grievant’s behavior was that Dr. Line-Nitu's letter failed to provide a specific end date or reevaluation date for Ms. O'Neil's incapacity. (Id. at 18-21.)
DISCUSSION
            “[A]n arbitration award is subject to a narrow scope of review." Sheriff of Suffolk Cnty. v. AFSCME Council 93, Loe. 419. 68 Mass. App. Ct. 222, 225 (2007), quoting Superadio Ltd.
 
                                                                        -8-

 
Partnership v. Winstar Radio Prods., LLC, 446 Mass. 330, 33 (2006). An arbitral award "carries a presumption of propriety because it is the arbitrator's judgment, not necessarily an objectively correct answer, for which the parties have bargained." Pittsfield v. Local 447 Int'l Bhd. of Police Officers, 480 Mass. 634, 638 (2018), citing United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 568 (1960). The Court’s review is thus "considerably more deferential than even the abuse of discretion or clear error standards," and an arbitrator's decision will be upheld "even where it is wrong on the facts or the law , and whether it is wise or foolish, clear or ambiguous." Pittsfield, 480 Mass. at 637-38 (citations omitted). Judicial review is limited to the grounds set forth in G.L. c. 150C, ' 11. School Comm. of Lexington v. Zagaeski  469 Mass. 104, 109 (2014). One such statutory ground, the only one the Committee argues, is if "the arbitrators exceeded their powers ... "G.L. c. 150C, ' 1l(a)(3).
I. Arbitrators' Interpretation of AWOL Provision
            The focal point of these consolidated matters is the meaning of the CBA's AWOL provision, and whether the Arbitrators permissibly interpreted the provision or exceeded their authority by improperly altering, adding to or modifying the provision. The Committee contends that the AWOL provision is susceptible to only one interpretation - viz., if a paraprofessional is absent for 15 days of more without approved leave, then just cause perforce exists to terminate his/her employment. Thus, the Committee argues, the Arbitrators impermissibly altered the CBA by layering onto construction an additional consideration of "mitigating circumstances." The Court does not agree.
            "[A]n arbitrator may not ignore the plain words of a contract." Sheriff of Suffolk Cnty., 68 Mass. App. Ct. at 226 (internal quotation omitted). "However, if there is room for doubt or interpretation on the question, then the issue properly lies within the broad authority conferred
 
                                                                        -9-
 
upon arbitrators of civil disputes."Id."So long as an arbitrate 's award draws its 'essence' from the parties' bargained-for contract language, a court has no place in disturbing the award, even if it disagrees with the arbitrator's interpretation of such contract language." Id., quoting United Paperworkers lnt'l Union. AFL-CIO v. Misco. Inc. 484 U.S. 29, 37-38 (1987). This generous deference rests on the fact that parties typically submit the interpretation of a collective bargaining agreement to an arbitrator because the "arbitrator may be uniquely qualified to interpret the 'law of the shop."' Zajaeski, 469 Mass. at 112, quoting School Dist. of Beverly v. Geller, 435 Mass. 223,230 (2001) (Cordy, J.,concurring).
            The CBA does not define "AWOL," so the Court construes the term "according to its plain meaning, in the context of the contract as a whole." Lieber v. President & Fellows of Harvard College, 488 Mass. 816, 823 (2022). "AWOL", of course, has its origins in military law, and is an acronym for "absent without leave." Black's Law Dictionary (11th ed. 2019). Like much other military jargon, however, including “missing in action” and “deadline,” the word "AWOL" has migrated into the civilian lexicon and its meaning has evolved. In the civilian world, it is often used sensu lato to mean "absent often without notice or permission." Id.; Merriam Webster's Dictionary (New Ed. 2022). Here, the Arbitrators did not ignore the plain word of the CBA, but instead interpreted the term “AWOL” in the broader, more lenient sense of two plausible meanings.

            Plainly, the CBA was not drafted with the intent of importing into its disciplinary regime the AWOL provision of the Uniform Military Code of Justice.[4] However, in advocating for what
 
---------------------------------------
 
[4] See 10 U.S.C. ' 886, Art. 86 "Absent without leave":
"Any member of the armed forces who, without authority - (1) fails to go to his appointed place of duty at the time prescribed; (2) goes from that place; or (3) absents himself or remains absent from his unit, organization, or place of duty at which he is required to be at the time prescribed; shall be punished as a court-martial may direct."
 
                                                                        -10-
 
it calls the provision's "plain meaning," the Committee urges what could alternately be called a strict or even (hyper)technical definition of"AWOL" -viz.,"absent without approved leave." Under the Committee's reading, BPS may deny leave and deem a paraprofessional “AWOL" based n any untimely or incomplete medical documentation submitted in support of an absence. BPS may then discharge the employee for cause if the absence exceeds 15 days. Such an interpretation, however, lays traps for an unwary employee who is incapacitated for an extended period and only able to submit medical documentation after more than 15 days of absence. Likewise, any minor delay or technical error in submitting required leave paperwork could jeopardize an employee's job. While the Committee suggests facially plausible reading of the CBA, viz.,that absent without approved leaved means absent without leave, the record by no means compels this interpretation and its potentially draconian results. Indeed, a reasonable employee reading the contract's AWOL provision, and with a commonsense understanding of the term, would likely be surprised to learn that even substantial compliance with the leave- seeking process would render his/her employment status unprotected. Such was the case for Ms. O'Neil. Other than pointing to the contract provision itself- which does not even include the phrase "absent without leave," much less define the meaning of "AWOL" in context-the Committee has not. cited anything to indicate that the parties intended "AWOL" to mean "absent without approved leave" rather than the more colloquial understanding of the term as "absent without notice."            
            Arbitrator Cenci explicitly drew this distinction, finding that the parties did not intend to apply the AWOL provision "in a mechanical or formulaic fashion." (Alford Dec. at 11.) Instead, and interpreting the "law of the shop", see Zagaeski, supra, arbitrator Cenci reasoned that "[t]he term ‘AWOL' , when used to justify dismissal, generally refers to situations where the employee
 
                                                                        -11-
 

has abandoned his or her job, and has made no attempt to communicate with the employer." (Id. at 10.) Before being deemed AWOL, therefore, an employee seeking approval for leave must be accorded "some additional flexibility to submit the required medical documentation." (Id. at 11.) While perhaps lacking the precision of Arbitrator Cenci's analysis, Arbitrator Tujano's decision rested on the same essential construction of the contract's AWOL provision - viz., that "the parties did not intend the provision to preclude consideration of mitigating factors," and "this [was] not a case where an employee abandoned their job for an extended period of time without notice[.]" (O'Neil Dec. at 19, 21.) The Arbitrator's interpretations are also consistent with BPS's own past practice. The OHC Manager testified that BPS had historically been flexible with deadlines for medical documentation, particularly during the pandemic. (See Alford Dec. at 4.) Past practice is, of course, among the most reliable guideposts for divining the meaning of a collective bargaining agreement. SeeChief Admin. Justice of the Trial Ct. v. Service Employees Int’l Union, Local 254. 383 Mass. 791, 794 (1981) ("[R]eference to previous practice is an orthodox source of meaning."); Massachusetts Corr. Officers Federated Union v. Sheriff of Bristol Cnty.,-55 Mass App. Ct. 285, 290 (2002) ("Past practices of the parties ... often serve as a basis for the interpretation of collective bargaining agreements."); Duxbury v. Duxbury Permanent Firefighters Ass'n, Loc.12167, 50 Mass. App. Ct. 4 1,465 (2000) ("[A]rbitrator may rightly look to past practice to resolve ambiguities.").[5]
            Contrary to the Committee's claims, the Arbitrators did not find that the Grievants were in  fact AWOL, and then impose an additional, fairness-based gloss on the term not contemplated
 
---------------------------------------
 
[5] Contrary to the Committee's contention, the Arbitrators' interpretations of the CBA here are consistent with a prior arbitral decision addressing the same issue under this contract. In Boston School Committee v. Sonego, AAA No. 11-390-227794 (1995) (Golick, Arb.). the arbitrator found that a teacher who had been absent for the first 30 days of the school year without any direct communication with BPS had effectively resigned his position. While this decision did not necessarily foreclose the possibility that employees might be considered AWOL for less egregious absences, Arbitrator Cenci's and Arbitrator Tufano's interpretation of "AWOL" to mean absent without notice is entirely in accord with the Sonego decision.
 
                                                                        -12-
 
by the contract. Rather, the Arbitrators merely noted that, while the Grievants' actions arguably violated a strict, hyper-technical reading of the AWOL provision, they did not offend the more natural and commonly understood meaning of the term the parties intended. If the Committee had wished to ensure that its strict and unforgiving interpretation prevailed, it could have bargained to define "AWOL" more explicitly in the contract, as other collective bargaining agreements have done.[6] Instead, the CBA entrusted the Arbitrators with a responsibility to interpret the term "AWOL" in a manner faithful to the parties' discernible intentions and past practice. This is clearly what they did, and their decisions will not be disturbed.
II. Public Policy

            The Committee's public policy arguments are equally availing. A "stringent, three-part analysis" applies to public policy challenges to an arbitration award. As expounded by the SJC: (1) the policy must be well defined and dominant, as ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest; (2) the public policy. exception must not merely address disfavored conduct in the abstract, but must target disfavored conduct which is integral to the performance of employment duties; and (3) the award reinstating the employee must violate that public policy. Pittsfield 480 Mass. at 639-40 (noting the courts "must be cautious about overruling an arbitration award on ... public policy [grounds]") (citations omitted). Accord  School Comm. of Lowell v Robishaw, 456 Mass. 653, 664 (2010)(conduct must implicate a well-defined and dominant public policy, it must be integral to employee's duties, and such conduct must require dismissal). The question is not whether the Grievants themselves violated public policy, but whether the Arbitrators' order(s) to
 
---------------------------------
 
[6] See, Buchanan v. Department of Energy, 247 F.3d 1333, 1335 (Fed. Cir. 2001); Davis v. George Washington Univ., 26 F. Supp. 3d 103, 108 (D.D.C. 2 14); Hill v. Metropolitan Transit Auth. No. 01-00-00115-CV, 2001 WL 40574, at *2-3 (Tex. App. Jan. 18,200I); Washington v. Southeast Pa. Transp. Auth. No. C.A. 84-0303, 1986 WL 2568, at *4 (E.D. Pa. Feb. 25, 1986).
 
                                                                        -13-
 
reinstate them do so. Boston v. Boston Police Patrolmen’s Ass’n,443 Mass. 813, 819 (2005) ("DiSciullo"). "If an award is permissible, even if not optimal for the furtherance of public policy goals, it must be upheld." Id., quoting Massachusetts Hughway Dep’t v. AFSCME Council 93,420 Mass. 13, 19 (1995).
            The Committee cites the Massachusetts Education Reform Act of 1993 (the "Reform
Act") as reflecting public policy interests in ensuring teacher accountability and quality of education in public schools. The Reform Act's specific policy goals include (a) creating an environment conducive to learning and free from threats to security or self-esteem; (b) providing sufficient resources to ensure a high-quality education for every child; (c) establishing and achieving specific educational performance goals for each student; and (d) holding educators accountable for their achievement. Zagaeski, 469 Mass at 112 -13. The Committee argues that the Arbitrators' more generous interpretation of the AWOL provision offends these policies, on account of the difficulties it imposes on BPS to find temporary replacements for employees on indefinite leave. The Committee maintains  that inasmuch as job applicants tend to prefer long-term/permanent positions, and BPS cannot post the same before terminating the employment of the current occupants, BPS must be free to discharge employees who fail to comply strictly with leave documentation requirements and are then absent for more than 15 days. Any limitation on such freedom, the argument goes, offends public policy.  The Court does not agree.
            In the abstract, reliable teacher attendance, continuity of instruction, and adequate staffing obviously bear a rational relationship to the policy objectives of the Reform Act. But the specific parameters and requirements of this relationship aren’t particularly well defined. It is, in fact, quite difficult to see how the goals of the Reform Act are targeted at the specific disfavored conduct at issue here-viz., a failure to comply strictly with the medical
 
                                                                        -14-
 

documentation requirements for approved leave. The Arbitrator' s awards do not require BPS to retain an employee who is unqualified, Robishaw, 456 Mass. at 665; has been dishonest, violated the law, or abused the public trust, see DiSciullo. 443 Mass. at 819; has assaulted or endangered students, Geller, 435 Mass. at 224 (Cordy, J.,concurring); or has committed some other form of serious of misconduct. Pub. Safety, 430 Mass. 601, 604rn.I (2000) ("[E]xamples of arbitration results that so offend public policy that they should be set aside by a court are not readily to be found. This is not surprising." (quotation omitted)). Notably, the Legislature has identified in explicit terms the types of misconduct that do undermine the goals of. the Reform Act and thus justify dismissal of a teacher- none of which are at issue here. See Zagaeski, 469 Mass. at 113, quoting G.L. c. 71, ' 42, third par. (providing that a teacher may be dismissed for "inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards....").There has been such challenge to the legitimacy of the Grievants' claimed conditional or the competency of their past job performance. Although the Reform Act likewise permits a principal to dismiss a teacher for "other just cause", G.L. c. 71, ' 42, third par., whether "just cause" exists to discharge a paraprofessional implicates only the specific terms of the AWOL provision; and that is a matter the parties have entrusted to the Arbitrators to determine.
            It is further apparent that strict compliance with the leave policy's medical documentation requirements is not integral to the duties of a paraprofessional and that minor delays and deficiencies in the submission of such documentation do not require dismissal. Of particular note, BPS has not historically enforced the leave policy's provisions in the inflexible manner the Committee now urges, nor deemed it necessary to discharge with dispatch employees who
 
                                                                        -15-
 
substantially provide the requested medical information. This is likewise not a case in which teachers were repeatedly truant or absent without notice, such that the school lacked an opportunity to prepare its staffing and/or students were subjected to a revolving door of substitutes; and that is plainly not that the Arbitrators' award require BPS to accept. The Committee overstates matters considerably when it suggests otherwise.
            In the case at bar, both Grievants notified BPS early in the school year that they intended to take extended leave. These paraprofessionals then engaged in extensive back-and-forth dialogue with BPS while absent.[7] Ms.Alford provided a specific end date for her leave, via a physician's letter; and any attentive recipient of Dr. Line-Nitu s correspondence regarding Ms. O'Neil's hospitalization would have understood that Ms. O'Neil was subject to ongoing evaluation.[8] Under these circumstances, BPS's purported need to enforce its medical documentation requirements strictly is far too attenuated from the policy objectives of the Reform Act to justify vacating an otherwise proper arbitration award. Moreover, it is far from clear how reinstating two experienced professionals who did not engage in any intentional misconduct, and who provided repeated (albeit imperfect) notice of their need for leave, would violate (rather than promote) the salutary policy goals of good education identified in the Reform Act. Last, and perhaps most importantly, any purported public policy supporting BPS's speedy dismissal of staff seeking healthleave would run afoul of numerous competing public policies,
 
---------------------------------------
 
[7] Ms. O'Neil communicated with BPS repeatedly, at least until she was hospitalized; and, thereafter, BPS was able to communicate with this employee through her attorney.

[8] For these reasons and others, this case is readily distinguishable from Pierson v. Stembridge, No. C.A. 07-3858-C, 2010 WL 3037502, at *6 (Mass. Super. Ct. May 24, 2010) (Lauriat, J.), which the Committee relies upon as purportedly establishing a public policy interest in teacher attendance. Setting aside the question whether a single decision of this Court, no matter how well reasoned, can establish a public policy, see Geller, 43S Mass. at 248 (Cowin, J., dissenting) ("Defining public policy is inherently a legislative and not a judicial, function"), Pierson involved a teacher who was tardy on 104 days in a single school year and only after she was discharged, requested an accommodation allowing her to arrive late and leave early. Id. at 6 & .2.
 
                                                                        -16-
 
well-established in Massachusetts and federal law, which favor interactive dialogue and reasonable accommodation when reconciling the needs of employees and employers where matters medical are concerned. Mass. Fair Employment Practices Act, G.L. c. 151B; Mass. Family Medical Leave Act, G.L. c.[175M; Federal Family Medical Leave Act, 29 U.S.C. ' 2615; Americans with Disabilities Act, 42 U.S.C. ' 12101; Rehabilitation Act of 1973, 29 U.S.C. 'As such, the recording fails to show that the arbitration awards in this case violate any well-defined public policy
CONCLUSION AND ORDER
            For the foregoing reasons, Plaintiff' s Motion for Judgement on the Pleadings shall be, and hereby is, DENIED, and Defend It's Cross-Motion for Judgement on the Pleadings shall be, and hereby is, ALLOWED.
            SO ORDERED.